Nicholas A. **CHIARAMONTE**, Plaintiff–Appellant,

v.

**FASHION BED GROUP, INC., A DIVISION OF LEGGETT & PLATT, INC.,** Defendant–Appellee.

No. 96–2987.

United States Court of Appeals, Seventh Circuit.

Argued April 24, 1997.

Decided Nov. 4, 1997.

Anthony Pinelli (argued), Chicago, IL, for Plaintiff–Appellant.

Walter Jones, Jr., Carole A. Corns, Dennis P.W. Johnson (argued), Pugh, Jones & Johnson, Chicago, IL, for Defendant–Appellee.

Before EASTERBROOK, KANNE and EVANS, Circuit Judges.

KANNE, Circuit Judge.

Nicholas A. Chiaramonte sued his former employer, Fashion Bed Group, Inc. ("FBG"), alleging that FBG improperly terminated him because of his age. FBG argued that it discharged Chiaramonte for financial reasons. The district court granted summary judgment in favor of FBG. The issue on appeal is whether Chiaramonte has presented evidence sufficient to withstand the summary judgment motion by showing that FBG's rationale for the termination was a pretext for age discrimination. Because we find that Chiaramonte failed to demonstrate a genuine issue of material fact regarding pretext, we affirm the district court's grant of summary judgment.

## I. History

FBG, a manufacturer of brass beds, engaged in a series of personnel reductions in 1991 and early 1992 that resulted in the termination of more than a third of the total FBG workforce. Chiaramonte lost his job in early 1992 in the last wave of these reductions.

Prior to his employment with FBG, Chiaramonte worked as a manager of engineering for Dresher, Inc. In 1985, when Chiaramonte was 52 years old, he joined Berkshire Furniture Co., Inc., in an equivalent position. John Elting, Berkshire's President, and Dick Singer, Berkshire's CEO, made the decision to hire Chiaramonte.

In 1988, Leggett & Platt, Inc. ("L & P") acquired Berkshire. L & P then also acquired Dresher and a third bed manufacturer, J.B. Ross. While L & P originally operated Berkshire, Dresher, and Ross as separate entities, L & P merged the three companies into a single company, FBG, in early 1991. Elting became President of the newly formed FBG, and Singer became CEO of the new company.

Elting selected the salaried employees that he thought FBG needed from the merged companies; the remaining employees were terminated. Elting appointed Chiaramonte to the position of Vice President of Engineering at FBG. Elting declined to hire the employee who held Chiaramonte's position at Dresher. At that time Chiaramonte was 57 years old.

In late 1991, as a result of a change in manufacturing methods, Elting bifurcated the position of Vice President of Engineering. Elting appointed Chiaramonte to the position Vice President of Research and Development, while Rob Cummins, an employee originally hired by Chiaramonte while he was at Berkshire, was assigned to the Director of Engineering position. Chiaramonte's position enabled him to focus on questions of manufacturing method, while Cummins handled the mundane, day-to-day detail work.

FBG experienced financial difficulties after the merger. FBG suffered losses in all four quarters of 1991. By year-end, although FBG expected to earn a $3.6 million profit, FBG had lost $6.6 million. The losses, among other factors, precipitated a massive lay-off. In November and December 1991, FBG terminated nearly one-third of its total workforce. Most of these terminated employees were unionized hourly factory workers.

In the first two months of 1992, FBG lost another $900,000. Elting decided that further personnel reductions were in order. Because he felt FBG was "top-heavy" in management, Elting looked to the salaried employees for the next set of terminations, using the payroll register to determine who

would be terminated. The register listed every employee at FBG, each employee's salary, and each employee's previous rate increases. It did not list age. Elting was the sole decision-maker regarding the salaried-employee terminations. He used three factors to determine which employee to terminate: salary, value to FBG, and performance. Based on the first two of these criteria, Elting decided to terminate Chiaramonte, who was earning $73,000 per year at the time.

Elting selected twelve employees for termination. The ages of the employees ranged from thirty-two to sixty-one. Elting submitted the list of names to L & P's Personnel Department to ensure the terminations complied with applicable law. Thereafter, Elting personally terminated all twelve employees. Elting terminated Chiaramonte effective March 13, 1992, explaining that the termination was a result of the need to "downsize." Chiaramonte was 59 years old at the time of his termination.

After meeting with Elting regarding the termination, Chiaramonte spoke with Singer. When Chiaramonte asked Singer why he was being terminated, Singer gave three reasons: Chiaramonte's time off for illness, the fact that Elting was on "an ego trip," and, "Well, there's age." Singer denies making any such statement. Chiaramonte also alleges that prior to his termination, he was told by Debbie Lunn, a cost manager, that FBG was "going to get rid of all you old people." Lunn denies making that statement.

Several people took over Chiaramonte's duties after his termination. Among them was Cummins. Elting retained Cummins, while terminating Chiaramonte, because he believed Cummins was the type of "detail" person needed for the day-to-day operations, and Cummins' salary was significantly lower than Chiaramonte's salary. FBG also hired two additional workers in February 1993, who assumed some of Chiaramonte's former responsibilities.

In October 1992, the Illinois Department of Human Rights held a fact finding hearing regarding charges filed by Chiaramonte and others against FBG. At the hearing, Elting testified regarding the reasons for each ter-

mination. In reference to Chiaramonte's termination, Elting testified that he chose to terminate Chiaramonte because he lacked "team synergy," due to "cultural differences," and because Chiaramonte would be unwilling to "crawl through the dirt" in rebuilding the new company.

## II. ANALYSIS

### A. Summary Judgment Standard

We review a district court's grant of summary judgment *de novo*, drawing our own conclusions of law and fact from the record before us. *See Thiele v. Norfolk & Western Ry. Co.*, 68 F.3d 179, 181 (7th Cir.1995). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). However, neither "the mere existence of some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, 106 S.Ct. at 2509–10 (emphasis in original), nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986), is sufficient to defeat a motion for summary judgment.

### B. Chiaramonte's ADEA Claim

■ Chiaramonte alleges that his termination was motivated by age animus. The ADEA prohibits employers from engaging in discrimination "because of [an] individual's age," 29 U.S.C. § 623(a)(1), though the prohibition is "limited to individuals who are at least 40 years of age." 29 U.S.C. § 631(a). The Supreme Court has interpreted this lan-

guage to mean that the ADEA prohibits all discrimination based on age but limits the class of persons protected by the statute to those persons 40 years of age and older. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 878, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996). To succeed in an ADEA claim, a plaintiff must establish that he would not have been terminated "but for" his employer's intentional age-based discrimination. *See Konowitz v. Schnadig Corp.*, 965 F.2d 230, 232 (7th Cir.1992).

■ A plaintiff may prove age discrimination in two ways. "She may try to meet her burden head on by presenting direct or circumstantial evidence that age was the determining factor in her discharge. Or, as is more common, she may utilize the indirect, burden-shifting method of proof for Title VII cases originally set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), ... and later adapted to age discrimination claims under the ADEA." *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 371 (7th Cir.1992) (quoting *Oxman v. WLS–TV*, 846 F.2d 448, 452 (7th Cir.1988)).

### 1. The Direct Method of Proving Age Discrimination

■ Establishing discrimination by the direct method requires the plaintiff to produce evidence that the trier of fact can interpret as an acknowledgment of the employer's discriminatory intent. *See Hill v. Burrell Communications Group, Inc.*, 67 F.3d 665, 667 (7th Cir.1995). Such evidence, therefore, "must relate to the motivation of the decisionmaker responsible for the contested decision." *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 203 (7th Cir.1996).

The parties take conflicting approaches in establishing whether there was any discriminatory intent in the decision to terminate Chiaramonte. FBG asserts that Elting was the sole decision-maker regarding Chiaramonte's termination. Thus any direct evidence Chiaramonte presents must relate to Elting's motivation for the firing. Chiaramonte, on the other hand, asserts that Elting was not the sole decision-maker. Therefore, Chiaramonte points to statements allegedly made by Dick Singer, FBG's CEO, and Debbie Lunn, a lower-level cost manager, to establish direct evidence of age discrimination. While Chiaramonte presents no evidence that Elting made statements supporting an inference of age animus, he argues that comments from other employees may be used to establish the discriminatory intent of FBG's management.

We disagree with Chiaramonte's allocation of decision-making authority. The facts establish that Elting alone was responsible for Chiaramonte's termination. Elting stated in his deposition that he alone exercised the power to select the candidates for termination and to make the terminations. Chiaramonte has presented no evidence to dispute this finding. The fact that Elting forwarded the list of potential terminations to L & P's Personnel Department does not suggest that Elting was not the sole decision-maker. Elting's list was not altered, amended, or otherwise adjusted as a result of this review. He simply ensured that his decisions complied with applicable laws. Additionally, Elting alone terminated each of the employees on the list.

Chiaramonte also argues that Elting discussed the terminations with Singer, and therefore, Elting was not acting alone. However, Chiaramonte provides no evidence supporting the contention that Singer had any decision-making responsibility with regard to the terminations. While Elting's deposition reflects uncertainty as to whether he discussed the terminations with Singer prior to their implementation, this ambiguity does not contradict Elting's statement that he had sole responsibility for the firings. *See Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216, 1221 (7th Cir.1991) (finding sole decision-maker despite fact that decisionmaker consulted with others), *overruled in part on other grounds by Oxman v. WLS–TV*, 12 F.3d 652, 657 (7th Cir.1993). In addition, Elting's uncertainty is resolved by Singer's unequivocal statement that he did not discuss the terminations with Elting prior to their occurrence.

Since Elting had sole responsibility for the terminations, any direct evidence supporting

the discrimination claim must relate to his motivation for the terminations. The statements of Singer and Lunn offered by Chiaramonte fall far short of demonstrating age animus on Elting's part.

### a. The Singer Statement

 Chiaramonte alleges that after receiving his termination notice from Elting, he spoke with Singer. During that conversation, Chiaramonte asserts that Singer, in suggesting reasons for the firing, stated, "Well, there's age." Singer denies making any such statement, and Chiaramonte does not corroborate his recollection of the conversation. Additionally, Chiaramonte's own recollection was unclear; during his deposition testimony Chiaramonte stated that Singer said, "Age had to be a factor ... but I don't know." Chiaramonte submitted no evidence suggesting that Singer would have knowledge of Elting's motivations for the terminations, and Singer's admission that he "didn't know" demonstrates that he was simply speculating as to Elting's motivations.[1] Singer was not the decision-maker, and his speculations do not provide a basis for charging Elting with discrimination. *See Jardien v. Winston Network, Inc.*, 888 F.2d 1151, 1155 (7th Cir.1989). Statements by a non-decision-maker that amount to mere speculation as to the thoughts of the decision-maker are irrelevant to our inquiry. Therefore, Singer's alleged statement does not provide the kind of "smoking gun" evidence required for a direct inference of discriminatory intent. *See Oxman*, 12 F.3d at 659–60 (rejecting as direct evidence statement of non-decision-maker); *Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 660 (7th Cir.1993) (finding that plaintiff failed to show sufficient connection between statement of nondecision-maker and

adverse employment decision to support case under direct method).

### b. The Lunn Statement

 Chiaramonte fares no better with the Lunn statement. Chiaramonte alleges that Debbie Lunn, who often socialized with Elting and others, stated that FBG was "going to get rid of all you old people." Lunn, like Singer, denies making such a statement. Even if such a statement was made, it has no probative value. Lunn is a lower-level cost supervisor who had no influence over personnel decisions. "Statements by inferior employees are not probative of an intent to discriminate by the decisionmaker." *Aungst*, 937 F.2d at 1221; *see also Oxman*, 12 F.3d at 659–60. Chiaramonte has failed to show that the termination decision made by Elting had any connection whatsoever to the opinion of a lower-level employee. That Lunn socialized with Elting and Cummins does not serve to make her comments any more relevant. "[A]ctions and comments by employees not involved in a discharge decision cannot provide a basis for charging other employees with discrimination." *Jardien*, 888 F.2d at 1155.[2]

### 2. Proving Age Discrimination by the Burden–Shifting Approach

 Since Chiaramonte cannot defeat the summary judgment motion on the strength of the proffered direct evidence, he must establish a genuine issue of material fact under the burden-shifting approach. In order to prevail under the burden-shifting approach, a plaintiff must initially establish a prima facie case of discrimination. "[T]he prima facie case requires 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion....'" *O'Connor*, 517 U.S.

---

1. Additionally, Singer testified that he did not know of Chiaramonte's termination until informed by Chiaramonte or another FBG employee. If he was unaware of the termination itself, it is fair to assume he was also unaware of the reasons supporting the termination decision.

2. Although this Court has stated that this principle is not to be applied rigidly, especially in circumstances "where an employee who is outside the chain of decision nevertheless has valuable information bearing on the charge of dis-

crimination," *Fortino v. Quasar, Co.*, 950 F.2d 389, 396 (7th Cir.1991), we do not find that such circumstances exist in this case. Chiaramonte makes no connection between Lunn's alleged statement and Elting's motivation. His only argument is that they socialized together, so Lunn was in a position to know Elting's reasons. However, this is mere speculation and does not constitute the kind of "valuable information" we referred to in *Fortino*.

at ——, 116 S.Ct. at 1310 (quoting *Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977) (emphasis in O'Connor removed)). To establish such a case under the ADEA, Chiaramonte must show (1) he was in the protected age group of 40 or older, (2) he was performing his job satisfactorily, (3) he was discharged, and (4) substantially younger, similarly-situated employees were treated more favorably.[3] *See id.* at ——, 116 S.Ct. at 1310; *Maier v. Lucent Technologies,* 120 F.3d 730, 734 (7th Cir.1997); *Denisi v. Dominick's Finer Foods, Inc.,* 99 F.3d 860, 864 (7th Cir.1996).

 A successful prima facie showing creates a presumption of discrimination that obligates the employer to produce a legitimate non-discriminatory reason for its decision. *See Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1122 (7th Cir.1994). Production of this legitimate nondiscriminatory reason rebuts this presumption of discrimination, *see Loyd v. Phillips Bros., Inc.,* 25 F.3d 518, 522 (7th Cir.1994), shifting the burden back to the employee to show that the employer's stated reasons for its action are pretextual. *See Denisi,* 99 F.3d at 864.

 A plaintiff can establish pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's explanation is unworthy of credence. *See Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1039 (7th Cir.1993). Where defendants have proffered more than one reason for the dismissal, plaintiff must address *all* the reasons suggested by the defendants. *See Wolf v. Buss America, Inc.,* 77 F.3d 914, 923 (7th Cir.1996), *cert. denied* —— U.S. ——, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996).

 Despite these shifting burdens of production, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Saint Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d

407 (1993) (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)). If the plaintiff is unable to meet this burden, his claim fails. *See Sarsha,* 3 F.3d at 1039.

The parties agree that Chiaramonte satisfies the first three requirements of the prima facie case. However, the parties present conflicting evidence regarding the fourth prong: whether a substantially younger, similarly-situated employee was treated more favorably. We need not resolve this dispute because we can decide this case on other issues. *See EEOC v. Our Lady of the Resurrection Med. Ctr.,* 77 F.3d 145, 149 (7th Cir.1996) ("[T]his court may advance to an ultimate issue in a summary judgment analysis and consider the discrimination question notwithstanding a dispute over a fact necessary for a *prima facie* case."); *see also United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant."); *Jayasinghe v. Bethlehem Steel Corp.,* 760 F.2d 132, 135 (7th Cir.1985) ("[T]he prima facie threshold is no longer a relevant issue once the defendant has come forward with evidence of legitimate reasons for its actions that would rebut a prima facie showing of discrimination."). Because we find that FBG has met its burden of articulating legitimate reasons for the discharge, we will proceed directly to whether Chiaramonte has presented evidence sufficient to create a genuine issue of material fact with regard to pretext.

 FBG presented two legitimate, nondiscriminatory reasons for Chiaramonte's termination: (1) FBG's need to reduce operating costs, and (2) the fact that Chiaramonte's job was not essential to FBG's continued operations. *See Baxter Healthcare Corp.,* 13 F.3d at 1125–26 (Employer does not violate ADEA by terminating employees

---

**3.** With regard to this last element, we note that the district court may have imposed a more stringent burden than was necessary under our precedent. However, this made little difference to the ultimate outcome in the district court because the district court, despite some question as to satisfaction of the last element, went on to analyze the case on the assumption that Chiaramonte established a prima facie case. Regardless, we review the record *de novo.*

to reduce salary costs.). As noted above, the mere production of these reasons shifts the burden to Chiaramonte to prove that the stated reasons are simply pretext for age discrimination.

 In assessing whether Chiaramonte has met his burden of showing pretext, this Court must consider the presumption of non-discrimination that arises from the facts of this case. We have previously held that when an employee is hired and fired by the same decision-maker in a relatively short time span, a presumption, or inference, of nondiscrimination arises. *See Our Lady of the Resurrection Med. Ctr.,* 77 F.3d at 152 (strong presumption of nondiscrimination where plaintiff hired and fired by same person in span of ten months); *Rand v. CF Indus. Inc.,* 42 F.3d 1139, 1147 (7th Cir.1994) (finding inference of nondiscrimination where plaintiff "was hired while in the protected class, and fired by the same person who hired him after a relatively short period of time"); *see also Proud v. Stone,* 945 F.2d 796, 797 (4th Cir.1991) ("[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by an employer.").

Elting hired Chiaramonte in 1985, when Chiaramonte was 52 years old and in the protected class. In 1991, L & P merged three subsidiaries, Berkshire, Dresher, and Ross, into a single entity: FBG. Following the mergers, FBG integrated the workforces of the three subsidiaries. Elting chose to retain Chiaramonte and appointed him Vice President of Engineering, while electing not to retain Chiaramonte's Dresher counterpart. Chiaramonte was 57 at that time. Less than two years later, Elting terminated Chiaramonte citing financial reasons.

Chiaramonte disputes the characterization of his "retention" after the merger, claiming

that this was not an affirmative act on Elting's part because his Dresher counterpart resigned after the merger and did not seek employment with FBG. Additionally, Chiaramonte claims that Elting did not consider any other candidates for the position of Vice President of Engineering. First, we note that Elting testified that he chose Chiaramonte because he "felt Nick was superior to the gentleman that was in the Dresher position." Thus it is not clear that Elting did not consider other candidates for the position, and there is no evidence suggesting that Elting was under an obligation to retain Chiaramonte. Second, Chiaramonte may only speculate about the reason his Dresher counterpart did not affirmatively seek employment with FBG. It is possible that the Dresher employee saw the writing on the wall, knew that Elting felt Chiaramonte was a superior employee, and chose not to seek employment with FBG for that reason. In short, Chiaramonte has not given us sufficient reason to doubt that Elting affirmatively chose to retain Chiaramonte in 1991, just two years prior to his termination.

While Chiaramonte was first hired almost seven years prior to his termination, we find that Elting's affirmative act of retaining him after the merger suffices for the purposes of the presumption. *See Ragland v. Rock–Tenn Co.,* 955 F.Supp. 1009, 1022–23 (N.D.Ill. 1997). It is highly doubtful that a person who hires an employee in the protected age group, and chooses to retain that employee after a merger, would fire that same employee less than two years after the retention as a result of a sudden "aversion to older people." *Lowe v. J.B. Hunt Transp., Inc.,* 963 F.2d 173, 175 (8th Cir.1992). Therefore, this Court will consider the presumption of nondiscrimination in evaluating Chiaramonte's argument that FBG's proffered reasons for his termination are pretextual.

FBG contends that its precarious financial situation justified Chiaramonte's termination.[4] In 1991, FBG expected to earn $3.6

---

4. FBG gives a second reason for Chiaramonte's termination: his skills were not essential to the continuing operation of the business. Chiaramonte does not separately address this reason in his brief. The cost-savings and skills justifi-

cations are somewhat intertwined; when Elting made the decisions regarding terminations, he looked to candidates' salaries and the contribution their skills made to the company. In this sense the grounds are intertwined: both ulti-

million but lost $6.6. million. FBG maintains that this loss precipitated the layoffs in 1992, when Chiaramonte was terminated. At the time he was terminated, Chiaramonte was salaried at $73,000 per year. FBG asserts that the personnel reductions in early 1992 (which included Chiaramonte as well as eleven other employees) saved FBG $750,000 in salary costs alone.

Chiaramonte first argues that an ambiguity exists over the actual losses sustained by the company that must be resolved by a jury. As evidence of this ambiguity, Chiaramonte points to a conflict between two affidavits, one which lists the losses as "operating losses," while the other lists the losses as "actual losses." We are not persuaded by this argument. First, as pointed out by the district court, the first affidavit, which described the losses as "actual losses," was unsigned and unsworn, and therefore not part of the record. *See Sellers v. Henman,* 41 F.3d 1100, 1101 (7th Cir.1994). Thus there is no "ambiguity"; there is only one affidavit in the record. Second, even if the affidavit was part of the record below, we see no material issue that must be resolved by a jury. Whether the affidavit used the term "actual losses," or the more specific accounting term "operating losses" is of no moment; both describe $6.6 million in losses, which is a far cry from the $3.6 million FBG expected to earn in 1991.

■ Chiaramonte then attempts to establish that the cost justification is pretext by showing that the terminations did not really save FBG much money. Additionally, Chiaramonte argues that the fact FBG retained management consultants at a cost of $1.5 million in the same month it terminated Chiaramonte for "cost-savings" shows that the cost justification was pretextual.

■ This Court has established that it "does not sit as a super-personnel department that reexamines an entity's business decisions." *Dale v. Chicago Tribune Co.,* 797

F.2d 458, 464 (7th Cir.1986). Instead, our task is to determine "whether the employer gave an honest explanation of its behavior." *Pollard v. Rea Magnet Wire Co.,* 824 F.2d 557, 560 (7th Cir.1987).

We first note that Chiaramonte himself confirmed FBG's dire financial situation in 1991. According to Chiaramonte, FBG was "dying" financially because it had "too many people, too much product, too much everything." In fact, Chiaramonte admits that FBG needed to downsize because it had "two people in every slot." Chiaramonte's assault on the financial justification accordingly does not focus on the 1991 time period, but instead focuses on events that occurred at FBG after his termination. Specifically, Chiaramonte argues that the pay increases given to Cummins, as well as the salaries of two workers hired in February 1993 [5] resulted in a $114,000 expenditure to achieve the same work Chiaramonte did for $73,000. We agree with the district court's analysis on this point. Chiaramonte cannot rely on events that occurred after his layoff to dispute that *at the time of his termination* cost was an appropriate justification. Indeed, as the district court noted, "[i]f the court were to accept Chiaramonte's argument, it would in effect have to hold that an inference of discrimination forms when a company that, at one time, was forced to 'downsize' for financial reasons, subsequently hires additional employees and gives salary raises to employees it chose not to terminate." *Chiaramonte v. Fashion Bed Group, Inc.,* 932 F.Supp. 1080, 1092 n. 5 (N.D.Ill.1996).

Chiaramonte also attempts to establish pretext by noting that FBG hired management consultants, at a considerable cost, in the same month that it terminated Chiaramonte. This is the kind of business decision that is best left to management, without second-guessing by the judiciary. That FBG tried to improve its situation by employing management consultants does not undermine

---

mately contributed to Elting's choice to terminate Chiaramonte. Chiaramonte had a high salary and his skills were not essential to the continuing needs of the business. Because Chiaramonte does not separately address this justification in his brief, we will treat the gener-

al arguments on the pretext issue as applying to both proffered justifications.

5. Chiaramonte fails to note that the two employees hired in 1993, ten months after his termination, were both 56 years old.

the contention that FBG was "dying" financially. A contrary decision by this Court would create a presumption of discrimination whenever a company expended resources in an attempt to increase profitability in a time of financial hardship. We decline to take such a step. FBG's management has the discretion to determine how and where to achieve necessary cost savings; our job is simply to ensure that the decisions management made did not turn on prohibited grounds. Based on the foregoing, we find that Chiaramonte has not presented sufficient evidence to create a genuine issue of material fact regarding FBG's claim of financial hardship.

Although we find that there is no genuine issue of material fact regarding FBG's financial situation, Chiaramonte may still prove pretext by showing that the proffered reasons did not actually motivate his discharge. *See Cliff v. Board of Sch. Comm'rs*, 42 F.3d 403, 412 (7th Cir.1994). Chiaramonte relies on three pieces of evidence to establish this: (1) alleged inconsistency between Elting's testimony before the Illinois Department of Human Rights ("IDHR") and his deposition testimony, (2) Singer's alleged statement to Chiaramonte after Chiaramonte informed him of the termination, and (3) Lunn's alleged statement.

■ During the IDHR fact finding conference, Elting gave the following reasons for Chiaramonte's termination: Chiaramonte was unable to "crawl through the dirt while rebuilding the company," there were "cultural differences in the organization," and Chiaramonte did not possess "team synergy." First, Chiaramonte argues that these are comments on his age. Second, he claims that Elting's failure to cite financial reasons for the discharge shows that the cost-savings justification Elting articulated in his deposition testimony is pretextual. We do not agree with either of Chiaramonte's assertions.

First, these statements are a far cry from the kind of statements we have found to be probative of age discrimination. *See, e.g., McNeil v. Economics Laboratory, Inc.,* 800 F.2d 111, 115 n. 3 (7th Cir.1986) (references to "over-paid and under-motivated veterans,"

the company's plan to replace "oldtimers" with "bright young people fresh out of college," and statement that "old pros" were "just old," support inference of age discrimination), *overruled in part on other grounds by Coston v. Plitt Theatres, Inc.,* 860 F.2d 834 (7th Cir.1988). Elting's statements are more similar to the statements in *Mills v. First Federal Savings & Loan Assoc.,* 83 F.3d 833 (7th Cir.1996), that we found were not sufficient to support a claim of age discrimination. In *Mills,* the plaintiff was told that management was "out to get rid of [her]" because there was the "concern that [she] may not be able to keep up ·with the [accounting] regulations." *Id.* at 841. While the plaintiff in Mills "took this to mean it was because of [her] age," *id.,* we emphasized that a plaintiff's subjective interpretation of her employer's statements is not controlling. "[I]f the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." *Id.* at 841–42 (citing *Visser v. Packer Eng'g Assocs.,* 924 F.2d 655, 659 (7th Cir.1991)). The instant facts are parallel. Even though Chiaramonte believes that Elting's comments are age-related, his interpretation is not controlling. We find that Elting's statements before the IDHR do not evidence age animus, and in fact are consistent with Elting's decision to retain the "nuts and bolts, the people who were responsible to get detail done."

We also note that Elting's deposition testimony is entirely consistent with the statement he gave to the IDHR. Elting testified that in making the determinations regarding terminations, he looked at salary level, value to FBG, and performance. Whether an employee would be willing to "crawl through the dirt" or work with a "team" are factors that affect an employee's value to FBG. After determining that Chiaramonte did not possess these qualities, Elting concluded that his contribution to FBG was incommensurate with his salary, and therefore he was eligible for termination. That the need for *any* terminations was prompted by financial concerns does not make the justifications as to

why this particular employee was terminated inconsistent with that concern. Thus, Elting could consistently state that financial concerns prompted the terminations, but it was Chiaramonte's lack of "team synergy," his unwillingness to "crawl through the dirt," and his incompatibility with firm "culture" that made him a strong candidate for termination. As such, we find no merit in Chiaramonte's contention that an alleged inconsistency between Elting's statements before the IDHR and his trial testimony supports an inference that FBG's reasons for his termination were pretextual.

▮▮▮▮ With regard to Chiaramonte's second and third pieces of evidence to show pretext, they are similarly unpersuasive. Chiaramonte argues that Singer's and Lunn's alleged statements create a genuine issue of material fact in regard to the question of pretext. In discussing Chiaramonte's direct case, we found these statements were not probative of discrimination. Under the same reasoning, we now find they are also insufficient to create a material issue on the question of pretext. Singer was not a decision-maker and was clearly speculating as to the reasons Elting terminated Chiaramonte. As such, his statement that "Age had to be a factor ... but I don't know" does not create an issue that requires a trial. Lunn's alleged statement also does not create a material issue; as a lower-level employee she had no control over the termination decision. The fact that she socialized with Elting, among others, does not suggest that she was in such a place of trust and confidence that she would be privy to Elting's motives. Thus the Singer and Lunn statements do not create a material issue on the question of pretext.

We find, therefore, after a review of all the evidence, that Chiaramonte has failed to establish a genuine issue of material fact as to whether FBG's proffered reasons for his dismissal were pretextual. This is particularly true in light of the presumption of non-discrimination created by the facts of this case. However, before we may affirm the district court's grant of summary judgment, we must examine plaintiff's final argument.

### 3. Chiaramonte's Claim That FBG Willfully Violated the ADEA

▮▮▮▮ Chiaramonte alleges that the improper release form FBG asked Chiaramonte to sign is direct evidence of willful discrimination.[6] To establish a willful violation of the ADEA, Chiaramonte must show either FBG knew its decision to terminate Chiaramonte violated the ADEA, or "showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Trans World Airlines v. Thurston*, 469 U.S. 111, 128, 105 S.Ct. 613, 625, 83 L.Ed.2d 523 (1985) (quoting *Air Line Pilots Association v. Trans World Airlines*, 713 F.2d 940, 956 (2d Cir.1983)). Elting was the sole decision-maker, so Chiaramonte must show that Elting either knew his decision violated the ADEA, or he intended recklessly to flaunt the requirements of the ADEA. There is no evidence from which the jury could conclude that either state of mind existed. In fact, the evidence submitted to the court tends to show exactly the opposite—that Elting sought the approval of L & P's Personnel Department to ensure that the terminations did not violate any applicable laws. In addition, even if the release was improper under the OWBPA, there is no precedent in this Circuit establishing that an improper release is evidence of willful discrimination. Therefore, given that the evidence shows that Elting went out of his way to ensure legality and the fact that this Circuit has found that releases, without more, at the most constitute "innocuous evidence of age awareness," *Partington v. Broyhill Furniture Indus.*, 999 F.2d 269, 271 (7th Cir. 1993) (stating that no inference of guilt may be drawn from fact employer asked older terminated worker to sign release); *see also Courtney v. Biosound, Inc.*, 42 F.3d 414, 420 (7th Cir.1994) (same), we find no genuine issue of material fact regarding Chiara-

---

**6.** Chiaramonte asserts that the release form is invalid and unenforceable under the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f)(1). The district court agreed with him, but found that the release did not constitute evidence of discrimination. The question of the validity of the release is not properly before us on appeal; however for the purposes of decision, we will assume, without deciding, that the release violates OWBPA.

monte's claim for willful violation of the ADEA.

Chiaramonte has not demonstrated the existence of a genuine issue of material fact with respect to his claim that he was terminated in violation of the ADEA. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (quoting First Nat'l Bank of *Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). Therefore we AFFIRM the district court's grant of summary judgment in favor of FBG.