In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-3674

CORAL MATEU-ANDEREGG,

*Plaintiff-Appellant,*

*v.*

SCHOOL DISTRICT OF WHITEFISH BAY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 00-CV-0837—**Charles N. Clevert**, *Judge.*

ARGUED MAY 29, 2002—DECIDED AUGUST 26, 2002

Before RIPPLE, DIANE P. WOOD, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Coral Mateu-Anderegg has sued the Whitefish Bay School District under Title VII, 42 U.S.C. § 2000e *et seq.*, claiming that she was not retained to teach in the district because of discrimination based on sex and national origin. The district court granted the School District's motion for summary judgment, dismissing the case. Mateu-Anderegg's appeal of that decision is now before us. We start with the facts.

Mateu-Anderegg was born in Spain in 1963; she came to the United States in 1986, when she married an American. At that time she was 23 years old. She obtained cer-

tification from the Wisconsin Department of Public Instruction to teach Spanish in kindergarten through grade 12, and during the 1992 through 1994 school years she taught full time in the Cedarburg, Wisconsin, school district.

In 1994 the Whitefish Bay School District hired her to teach part time, which she continued to do through 1997. During the latter year she also taught in the Shorewood School District, where she was offered a full-time position for the next year. Despite the offer from Shorewood, she remained at Whitefish Bay through the 1997-98 school year, teaching more classes, but still not doing so full time. Since 1996 she has also been a lecturer at the University of Wisconsin-Milwaukee.

Neil C. Codell became the principal of Whitefish Bay High School in 1997. He told Mateu-Anderegg that he would be interviewing her and other candidates for a full-time position teaching Spanish for the school year beginning in the fall of 1998. During her interview with Codell, he told her about his wife, who he said "is the best teacher in the world." But he also said she made the "right decision" to stay home with their children who are "the number 1 priority," and who were roughly the same age as Mateu-Anderegg's children. Codell recommended hiring Mateu-Anderegg for the 1998-99 school year. And as it turned out, he did not interview anyone else for the position.

Just before the beginning of the 1998-99 term, Mateu-Anderegg's husband collapsed while he was jogging. He was in a coma for 2 days and underwent open heart surgery. He was hospitalized for about 2 weeks. During his illness, Mateu-Anderegg was given a leave of absence, and so she did not begin teaching until several weeks into the school year. When Mateu-Anderegg called Codell to say she was ready to return to work, he advised her

to take more time off to care for her husband and to take off as much time as she needed.

She returned to work, and sometime later, Codell told her that the students were complaining about an examination she had given and that some students were asking to drop her class. Codell found fault with the way the examination was written and said that it did not appear that she knew how to relate to the students. She also claims that Codell blamed the problem on her failure to take more time off. Codell instructed Mateu-Anderegg to rewrite the exam. She continued to have problems with students, particularly a rather rowdy class which met the last period of the day. Mateu-Anderegg issued disciplinary detentions to some of these students and they, in turn, went to Codell and guidance counselors to complain. Mateu-Anderegg was very unhappy about the way the counselors and Codell handled the situation, basically questioning her teaching ability.

Mateu-Anderegg's job performance was formally evaluated four times throughout the 1998-99 school year by Codell and also by a vice-principal. The evaluations reveal some concerns about Mateu-Anderegg's teaching style and indicate that she needed to provide better instructions to students and more explanations of classroom activities and assignments; they also indicate that she needed to encourage more student involvement in the classroom and to use varied strategies of instruction. Codell and Mateu-Anderegg discussed several areas of concern, one of which was referred to as her "mono dimensional" teaching style. Codell seemed to think that she spent too much time in front of the class reading from a textbook; he also thought she spoke in Spanish too much and that the students could not understand her. During this session, Mateu-Anderegg contends that Codell expressed surprise that, after having lived in the

United States for a dozen years, she had not learned to relate better to American students.

Students and parents complained to Codell about Mateu-Anderegg's teaching, saying she had poor classroom management, difficulty communicating with students, an inconsistent grading system, and that she imposed excessive discipline, even to students who were not otherwise discipline problems. Students also professed not to know the reasons for disciplinary detentions imposed on them.

Codell often met with Mateu-Anderegg to discuss the complaints. During these meetings, Mateu-Anderegg believed that he was very angry with her and did not give her a chance to explain her actions.

In December 1998 Codell informed Mateu-Anderegg that he was considering not renewing her teaching contract. He testified in a deposition that he was concerned about her classroom performance and her inability to relate to the students. In January 1999 Codell met with Mateu-Anderegg and other members of the foreign language department. A plan was formulated to address disciplinary matters in Mateu-Anderegg's classes. Later that day, Mateu-Anderegg met with Codell in his office, at which time he recommended that she turn over her last-period class to another teacher, Jim Weissner. She says that Codell stated that her class load was too much for her, given everything that had happened to her husband, and that she should give up the class to go home and spend more time with her children.

In February 1999 Mateu-Anderegg received preliminary notice that her contract would not be renewed. She requested a private conference with the school board, and she asked for a written statement of the reasons for the nonrenewal. Early in March she received a notice of a hearing, but she withdrew her request that it be held, stating that she did not agree with the reasons given for

nonrenewal of her contract. Of note is the fact that she did not raise any concern about discrimination at this time. By letter dated March 15, she was informed that the reasons for nonrenewal were her ineffective and limited teaching style, inconsistent and inappropriate discipline of students, poor relationship with other staff members, and failure to fully comply with the expectations and responsibilities of a teacher in the Whitefish Bay public schools. The board voted, unanimously, not to renew her contract. That action left a vacancy in the foreign language department. Based on Codell's recommendation, a woman named Julie Strassburger was hired to fill the position.

As Mateu-Anderegg sees it, the real reason her contract was not renewed was not deficiencies in her teaching, but discrimination based on sex and national origin. As evidence, she cites Codell's remarks about caring for her husband and children and a remark that more men were needed in the foreign language department—remarks, we find, which are susceptible of more than one interpretation. Regarding discrimination on the basis of national origin, she claims that in February 1998 Codell told her that often native speakers did not make the best language teachers. She claimed he also attributed her difficulty with the students to the fact that she was from another culture. He expressed surprise that after 12 years she had not more thoroughly assimilated into American culture. She said she believed that in some general way Codell did not like her because she was from Spain.

Mateu-Anderegg had complained to other people about Codell's treatment of her. She complained to her union representative, Mary Ott. But Ott does not remember that Mateu-Anderegg complained that Codell was expressing sexist attitudes. She also complained to Director of Personnel Gary Schumacher that the nonrenewal was unfair and based on Codell's opinion of her.

During the 1998-99 school year there were eleven full-time, nontenured teachers at Whitefish Bay High School. The contracts of Mateu-Anderegg and one other teacher were not renewed. The other teacher was a male who was born in the United States. He chose to resign rather than to have his contract formally not renewed by the school board.

Mateu-Anderegg contends that she has raised genuine issues of material fact regarding discrimination based on gender and national origin by both the direct and the indirect methods of proof and that summary judgment should not have been granted. The School District contends that, for a number of reasons, it was entitled to summary judgment.

We review a motion for summary judgment *de novo*. *Thiele v. Norfolk & Western Ry. Co.*, 68 F.3d 179 (7th Cir. 1995). Summary judgment is proper where the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In determining whether a genuine issue of material fact exists, we construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 77 U.S. 242 (1986).

As is well-established, a plaintiff in a Title VII case may proceed under either a direct or indirect method of proof. *Troupe v. May Dep't Stores*, 20 F.3d 734 (7th Cir. 1994). We will first turn to Mateu-Anderegg's direct method of proof.

Her contention is that statements made by Principal Codell reveal his discriminatory intent. Statements revealing discriminatory intent—if that is what Codell's statements are—are one kind of "evidence that can be interpreted as an acknowledgment of discriminatory intent

by the defendant or its agents . . . ." *Troupe*, at 736. But the School District contends, correctly, that such statements are only relevant if they come from a decisionmaker, someone involved in the adverse employment decision. On less solid ground, the District then says that Codell was not a decisionmaker, making an argument which seems to tangle concepts from Title VII analysis with analysis under 42 U.S.C. § 1983.

The District points to Wis. Stat. § 118.22, which sets out procedures that the school board must follow in renewing or not renewing teacher contracts. Thus, the District argues that the school board is the only entity which could affect Mateu-Anderegg's employment. In other words, Codell is the only person alleged to have exhibited discriminatory intent, but he is not the person with final authority under the statutes, and therefore there is no direct proof of discrimination. The argument echoes issues which arise under § 1983, when, say, a school board is named as a defendant, but the only alleged constitutional violation involves the actions of a principal or teacher or other employee. Section 1983 requires that in such a situation the actual perpetrator be named as the defendant. There is no respondeat superior liability under § 1983. *See*, *e.g.*, *Gernetzki v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464 (7th Cir. 2001), *cert. denied*, 122 S. Ct. 1606 (2002).

The same is not true under Title VII. The statute itself defines employer as "a person engaged in an industry affecting commerce . . . and any agent of such a person . . . ." 42 U.S.C. § 2000e(b). Courts are to interpret Title VII "based on agency principles." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986). Furthermore, we are to rely on the "general common law of agency, rather than on the law of any particular State, to give meaning to these terms." *Community for Creative Non-Violence v. Reid*, 490

U.S. 730, 740 (1989). For purposes of sexual harassment claims, the Court has said that a tangible employment action requires "an official act of the enterprise, a company act." *Burlington Indus.*, at 762. But it is clear that a supervisor, whose actions must be approved somewhere up the hierarchy, can be the agent of the employer. In *Burlington Industries*, the Court cited previous cases to that effect: *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990), in which the supervisor did not fire the plaintiff, rather a committee did, but the employer was liable because the committee functioned as the supervisor's "cat's-paw"; and *Kitcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir. 1992), in which the court said that from "the perspective of the employee, the supervisor and the employer merge into a single entity."

To support its argument, the School District cites language from *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391 (7th Cir. 1997), a Title VII case which says that the statements revealing discriminatory intent must come from the decisionmaker. That, of course, is true. If a fellow teacher with no authority for hiring or firing had made allegedly discriminatory statements, there would be no direct evidence in this case. But *Chiaramonte* cuts both ways. There, the statements of one John Elting, the employee making the employment decision, were evidence of discrimination. Statements of other employees were not, but that case is somewhat like Mateu-Anderegg's case because Elting sent the list of persons to be terminated upstairs to the personnel department. There was no evidence that the personnel department altered the list, and for that reason, Elting was considered a decisionmaker despite the fact that he sent the list "upstairs." We have no evidence in this case that Codell's recommendations were not similarly followed by the school board. In fact, what we do know is that his recommendation to hire Mateu-Anderegg and the decision to

not renew her contract were followed. The other teacher recommended for nonrenewal resigned, perhaps because he believed that Codell's recommendations would be followed. Depending on how a particular school district operates, it seems likely that a principal or a superintendent can be a decisionmaker for purposes of Title VII. We have no information which leads us to conclude otherwise in this case, and our conclusion is not novel. In *Clearwater v. Independent School District No. 166*, 231 F.3d 1122 (8th Cir. 2000), a Native American woman alleged discrimination against a Minnesota school district. As direct evidence, she cited remarks the superintendent made about pitching a tent and "scrub" Indian ponies. The court found, in the context of the case, that these were only "stray" remarks and therefore not direct evidence of discrimination. The superintendent, however, was considered a decisionmaker.

On this record, we cannot say, as a matter of law, that Codell is not an agent of the employer, within the meaning of Title VII.

That being said, however, we find that there is no genuine issue of material fact that Codell's statements fail to provide direct evidence of discrimination. Mateu-Anderegg draws attention to remarks Codell made which she contends show that he thought she should stay home and take care of her children. To repeat his remarks, at her interview with him for her full-time position, he said his wife was the "best teacher in the world" but that she had given up teaching to stay home with their children. Again, after Mateu-Anderegg was having discipline problems with her last period class, Codell suggested that she give up that class and go home to be with her children. These remarks hardly show the kind of discriminatory intent required. In fact, it was *after* the first remark was made that Codell *hired* Mateu-Anderegg. The suggestion that she give up the 7th period class was made in

the context of trying to find a solution to a serious discipline problem. The remark that more men were needed in the department is not overtly discriminatory, especially because she does not emphasize the gender breakdown of the department and because Codell hired another woman to replace Mateu-Anderegg.

When evaluating direct evidence in support of a plaintiff's position, we look at the context in which a statement was made:

> [A]mbiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence nonconclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff.

*Troupe*, at 737. Here, rather than supporting Mateu-Anderegg's claim, the mosaic detracts from it. What is clear is that she was having trouble in the classroom. She uses a statement from Judy Born, another teacher of 40 years teaching experience, to support her discrimination claim. Ms. Born says:

> My perception of the "problem" with Coral which so enraged the administrator is this. Coral, who expected all of her students to earn their grades by participating fully in class activities and by exemplifying appropriate class behavior, angered some students to whom she gave detentions for non-compliance. Instead of following the appropriate procedure, these students went directly to the school principal. . . . Several other students, who have since expressed regret over their actions, "jumped on the band wagon." . . . With little opportunity to defend herself, Coral was blamed and fired.

In fact, this statement would support a claim that Mateu-Anderegg was not given the help or support she might have expected from the administration, but there is noth-

ing in the statement which lends support to any claim that her sex or national origin had anything to do with her situation.

Codell's remark that Mateu-Anderegg should take all the time she needed to care for her husband when he was recuperating from heart surgery can as easily show compassion which, hopefully, would be extended as well to a man whose wife was recovering from major surgery. In fact, the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, requires that employees be given time off in such situations. It would be terribly unfair to consider Codell biased for this remark.

As to her claim of discrimination based on national origin, Mateu-Anderegg cites statements Codell made to the effect that he wondered why, after living in the United States for 12 years and being married to an American, she had not become more assimilated into the culture. There is nothing in those remarks to show a bias against persons of Spanish heritage.

Because Mateu-Anderegg cannot defeat summary judgment based on direct evidence, we will examine how she fares under the familiar burden-shifting approach set out in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). To establish a prima facie case of discrimination, Mateu-Anderegg must show that she belongs to a protected class, that she was performing up to the employer's legitimate expectations, that she suffered an adverse employment action, and that the employer treated similarly situated employees outside the protected class more favorably. *Oates v. Discovery Zone*, 116 F.3d 1161 (7th Cir. 1997). It is undisputed that she is a member of two protected classes and that she suffered an adverse employment action. But what also seems indisputably clear is that she was not performing up to the employer's legitimate expectations.

Consideration of the employer's legitimate expectations ties in with the next step in the burden-shifting analysis. The employer must provide legitimate, nondiscriminatory reasons for the employment action and, if that is done, the plaintiff must show that the reasons given are pretextual. As is often the case, these items tend to merge. *See*, *e.g.*, *Denisi v. Dominick's Finer Foods*, 99 F.3d 860 (7th Cir. 1996). The reasons given for the nonrenewal of Mateu-Anderegg's contract indicate that she was not meeting the employer's legitimate expectations. Those reasons were her ineffective and limited teaching style, inconsistency and inappropriate discipline of students, poor relationship with other staff members, and a failure to comply with the expectations and responsibilities of a teacher. The record in this case supports the School District's contention that Mateu-Anderegg was not meeting its expectations. As the evaluations show, there were concerns about her teaching style. There was considerable discontent shown by both students and parents, particularly about her inability to control her class and her method of dealing with discipline problems. Ms. Born's statement indicates her belief that the problems Mateu-Anderegg faced involved discipline and teaching philosophy.

It may very well be that Codell did not provide Mateu-Anderegg with the level of support she needed to succeed. It seems clear they did not get along very well. It may even be that Codell was not a particularly good principal. Mateu-Anderegg points out that the District must have known "more about Codell than it has thus far acknowledged" because of his "serendipitous resignation shortly following Mateu-Anderegg's non-renewal . . . ." However, even were we to conclude that Codell did not perform ideally in this situation, Mateu-Anderegg has not raised a genuine issue of material fact as to whether his failure had anything to do with bias against her be-

cause she is a woman or because she is of Spanish descent or, in *McDonnell Douglas* terms, that she was meeting her employer's legitimate expectations, or that the reasons given for nonrenewal were a pretext for discrimination based on sex or national origin. On this record, summary judgment for the School District was properly granted. The judgment of the district court is AFFIRMED.

RIPPLE, *Circuit Judge*, concurring.   I concur in the judgment of the Court. I write separately because I take a somewhat different view of the record than my colleagues. In my view, the record does not support the conclusion that Mr. Codell served as a decisionmaker in the non-renewal of Ms. Mateu-Anderegg's teaching contract.

As a general proposition, our case law establishes that "[s]tatements by subordinates normally are not probative of an intent to [discriminate] by the decisionmaker." *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 546 (7th Cir. 1997). Indeed, "only evidence on the attitudes of the employees involved in the decision to fire the plaintiff[] is relevant." *Swanson v. Leggett & Platt, Inc.*, 154 F.3d 730, 733 (7th Cir. 1998). Simply put, when an individual plays no role in an adverse employment action, his discriminatory animus generally proves irrelevant concerning the motivation behind an employer's employment decisions. Thus, the random racial slur or hostile comment of a co-worker that is unconnected to an employment decision proves insufficient to maintain a discrimination claim under Title VII. *See Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997).

However, "if a manager with a [discriminatory] motive is involved in the decision to terminate an employee, that [discriminatory] motive, in some circumstances, may be imputed to the company, even if the manager with a [discriminatory] motive was not the ultimate decision-maker." *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1010 (7th Cir. 2000). Accordingly, "there can be situations in which the forbidden motive of a [non-decision-making] employee can be imputed to the employer because, under the circumstances of the case, the employer simply acted as the 'cat's paw' of the [non-decisionmaker]." *Willis*, 118 F.3d at 547.

Although this court has not identified the outer contours of this exception, *see Willis*, 118 F.3d at 547, certain recurring principles can be gleaned from the case law. In particular, we are concerned with the influence and input that the biased employee exerts over the decision-making process. Thus, "[s]ummary judgment is generally improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994). For instance, when a biased employee makes a discriminatory statement in the context of a plaintiff's performance review—an evaluation that may be passed along to the decisionmaker—the subordinate's attitudes become relevant to the discrimination calculus. *See, e.g., Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998). More to the point, if the plaintiff proffers evidence demonstrating that the biased non-decisionmaker concealed "relevant information from the decisionmaking employee or feed[s] false information to him," then the animus of the non-decisionmaker becomes relevant because he "is able to influence the [employment decision.]" *Wallace*, 103 F.3d at 1400. Essentially, then, "these cases prevent an employer from escaping lia-

bility by setting up many layers of pro forma review, thus making the operative decision that of a subordinate with an illicit motive." *Willis*, 118 F.3d at 547. However, "it is clear that, when the causal relationship between the [non-decisionmaker's] illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissible basis, the bias of the [non-decisionmaker] is not relevant." *Id.* For instance, if objective information from sources other than the biased employee drive the adverse employment action, the subordinate's illicit motives are no longer relevant to the inquiry. *See id.*

In this case, I do not believe that it is appropriate to characterize the School Board's actions as merely rubber-stamping the contract-renewal recommendations of Mr. Codell. Wisconsin law assigns authority over renewal decisions to the local school boards. *See* Wis. Stat. § 118.22. On this record, there is no indication that this School Board delegated its responsibility to Mr. Codell or otherwise failed to conduct an independent review of his renewal recommendations. Indeed, in February 1999, the Board sent Ms. Mateu-Anderegg a letter that stated in pertinent part:

> [Y]ou are hereby put on notice that the School Board of the School District of Whitefish Bay is considering the recommendation of the administration that your employment contract not be renewed. . . . [Y]ou have the right to file a request with the Board . . . for a private or public conference with the Board relative to the subject of non-renewal of your contract. . . . You are further advised that if you desire a conference, you will be provided, prior thereto, with written reasons as to why the Board is considering your non-renewal. At such conference, you have the right . . . to call witnesses and submit evidence relevant to the subject of the non-renewal of your contract. You also

> will have the right to question witnesses and rebut any testimony which might be unfavorable to you.

R.40, Ex.12. Far from functioning as a pro forma review panel, the School Board planned to conduct an independent inquiry into the allegations underpinning Mr. Codell's non-renewal recommendation. Simply put, but for her declining to participate in this hearing, Ms. Mateu-Anderegg would have been given an opportunity to present her side of the dispute to the School Board. Under these circumstances, I would hold that the record establishes that the School Board was the final decisionmaker, and there is no evidence that it made its decision on anything other than the stated job-performance related reasons. We have never established a presumption that school boards do not make their decisions independently of subordinate officials, and the record in this case hardly affords a basis for doing so today.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*