Donald **BAILEY**, on behalf of himself and all others similarly situated, Plaintiff,

v.

Dan **CANAN**, Mayor, City of Muncie, individually and in his official capacity, Joseph Winkle, Chief of Police, individually and in his official capacity, and The City of Muncie, Indiana, Defendants.

No. IP97–1483–CM/S.

United States District Court, S.D. Indiana, Indianapolis Division.

Jan. 25, 2000.

Steven C. Smith, Smith Ragains & Cotton, Anderson, IN, for Plaintiff.

Donald S. Smith, Pamela G. Schneeman, Riley Bennett & Egloff, Indianapolis, IN, for Defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

McKINNEY, District Judge.

This cause is before the Court on motion for summary judgment of defendants, Dan Canan, Mayor, City of Muncie (the "City"), Joseph Winkle, Chief of Police, and the City of Muncie, Indiana (collectively "Defendants"). The Defendants have also filed a motion that the court accept all of Defendants' statements of material fact as true and uncontroverted pursuant to Local Rule 56.1(g) because the plaintiff, Donald Bailey ("Bailey"), failed to comply with the requirements set forth in Local Rule 56.1(f)(2). In addition, the Defendants have moved to strike certain factual assertions made by Bailey in his brief in opposition to the Defendants' motion for summary judgment.

The Court has reviewed the materials submitted by the parties and for the reasons stated herein, the Court **GRANTS** in part and **DENIES** in part the Defendants' motion to accept their statements of material fact as true and uncontroverted. In addition, the Court **GRANTS** in part and **DENIES** in part the Defendants' motion to strike various factual assertions in Bailey's brief in opposition to Defendants' motion for summary judgment. Finally, the Court **GRANTS** the Defendants' motion for summary judgment.

## I. PROCEDURAL BACKGROUND

Bailey filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 20, 1997 and he received notice that his charge was dismissed along with a right to sue letter that was dated June 6, 1997. Bailey filed his original action on September 5, 1997.[1] Bailey asserts that the Court has jurisdiction over these matters pursuant to 29 U.S.C. §§ 621 and 623, 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343(a)(3).

Bailey filed a second amended complaint on September 30, 1998 alleging that the City had discriminated against him because of his age in violation of the Age Discrimination in Employment Act ("ADEA"). 29 U.S.C. §§ 621–34. Pursuant to 42 U.S.C. § 1983, Bailey also alleged that under color of state law Muncie Mayor Dan Canan ("Mayor Canan") and Muncie Chief of Police Joseph Winkle ("Chief Winkle") had violated his right to due process guaranteed to him by the Fourteenth Amendment to the U.S. Constitution by suspending him for ten days without opportunity for a hearing and by denying him the opportunity to appeal his superior's determination to invoke the suspension. The Defendants filed a motion for summary judgment on August 5, 1999 asserting there are no genuine issues of material fact on the questions of whether the City had legitimate, non-discriminatory reasons for its employment decisions involving Bailey, and whether Bailey had a legally protected interest in a suspension of less than ten days, and therefore, no right to a hearing either before or after such a suspension. Having reviewed the procedural background, the Court now

1. Bailey does not state the date he received the EEOC's notice of dismissal and right to sue letter, so the Court cannot determine whether Bailey timely filed his original complaint. September 5, 1997 is the ninety-first day after the date marked on the EEOC's notice. The Court will assume for purposes of this motion that Bailey received the EEOC's notice at least one day after it was dated by the EEOC.

turns to a brief overview of the standards governing its decision.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *Id.*

The moving party has the initial burden to show the absence of genuine issues of material fact. *See Schroeder v. Barth*, 969 F.2d 421, 423 (7th Cir.1992). This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof. *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n. 3 (7th Cir.1994). The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Scherer v. Rockwell Int'l Corp.*, 975 F.2d 356, 360 (7th Cir.1992). The opposing party must "go beyond the pleadings" and set forth specific facts to show that a genuine issue exists. *See Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1261 (7th Cir.1993), *cert. denied*, 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994). This burden cannot be met with conclusory statements or speculation, *see Weihaupt v. American Med. Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989), but only with appropriate citations to relevant admissible evidence. *See* Local Rule 56.1; *Brasic v. Heinemann's Inc., Bakeries*, 121 F.3d 281, 286 (7th Cir.1997); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923–24 (7th Cir.1994). Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a summary judgment motion, a court must draw all reasonable inferences "in the light most favorable" to the opposing party. *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992). If a reasonable fact finder could find for the opposing party, then summary judgment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992). When the standard embraced in Rule 56(c) is met, summary judgment is mandatory. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Shields Enters.*, 975 F.2d at 1294.

The summary judgment standard is applied with added rigor in employment discrimination cases because of the crucial role played by motive, intent and credibility in resolving such cases. *Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 714 (7th Cir.1999). However, even when discriminatory intent is at issue, the evidence must not only address the issue of intent, but also relate to the specific employment decision in question. *Cowan v. Glenbrook Security Serv., Inc.*, 123 F.3d 438, 443 (7th Cir.1997). Further, the non-movant will not defeat summary judgment merely by pointing to self-serving allegations or conclusory statements in affidavits without other evidentiary support. *Cliff v. Board of Sch. Comm'rs*, 42 F.3d 403, 408 (7th Cir.1994) (citing *McDonnell v. Cournia*, 990 F.2d 963, 969 (7th Cir.1993)). *Accord Chapple v. National Starch & Chem. Co.*, 178 F.3d 501, 504 (7th Cir.1999).

Pursuant to Southern District of Indiana Local Rule 56.1 ("L.R. 56.1"), the moving party is required to submit a Statement of Material Fact that complies with L.R. 56.1(f). L.R. 56.1(a)(1). Similarly, the non-moving party is required to provide a Response to Statement of Material Facts

that complies with the same section. *See* L.R. 56.1(b)(1). In addition, any facts that the non-moving party wishes to add to the Statement of Material Fact must be filed as a separate Statement of Additional Material Fact, that must also comply with L.R. 56.1(f). L.R. 56.1(b)(1). Section (f) provides in pertinent part:

(f) *Requirements for Factual Statements and Responses Thereto.*

(1) *Format and Numbering.* The Statement of Material Facts shall consist of numbered sentences. The Response to Statement of Material Facts must be numbered to correspond with the sentence numbers of the Statement of Material Facts, preferably with each respective factual statement repeated therein. Any Statement of Additional Material Facts must consist of numbered sentences and start with the next number after the last numbered sentence in the Statement of Material Facts....

(2) *Format of Factual Assertions.* Each material fact set forth in a Statement of Material Facts, Response to Statement of Material Facts, Statement of Additional Material Facts must consist of concise, numbered sentences with the contents of each sentence limited as far as practicable to a single factual proposition. Each stated material fact shall be substantiated by specific citation to record evidence....

(3) *Format of Objections to Asserted Material Facts or Cited Evidence.* Objections to material facts and/or cited evidence shall (to the extent practicable) set forth the grounds for the objection in a concise, single sentence, with citation to appropriate authorities.

L.R. 56.1(f)(1)–(3). Finally, the rule also provides that "[i]n determining the motion for summary judgment, the Court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are specifically controverted or objected to in compliance with L.R. 56.1(f)." L.R. 56.1(g).

The Court may use its discretion in deciding how strictly to enforce compliance with L.R. 56.1. *See* L.R. 56.1(k); *see also Bradley v. Work*, 154 F.3d 704, 708 (7th Cir.1998) (finding that the district court in that case "was within its discretion to insist on compliance with [L.R.] 56.1").

## III. DISCUSSION

### A. FACTUAL BACKGROUND

The majority of the facts set out herein were provided by the Defendants. Defendants set out 161 individual statements of material fact in a section of their brief. Defs.' Br. In Supp. Of Mot. For Summ.J. at 1–26. Bailey, however, failed to respond by admitting, denying or objecting by individual paragraph as required by L.R. 56.1. Instead, Bailey provided a one sentence blanket denial of all the facts set forth by the Defendants. Pl.'s Answer To Defs.' Mot. For Summ.J. ¶ 1. In addition, Bailey set out his own version of the facts in his brief in opposition to the Defendants' motion, however, did not provide citation to relevant evidence of the kind admissible at trial for each statement or number each statement of fact separately. Pl.'s Br. In Opp'n To Defs.' Mot. For Summ.J. at 1–4. Bailey clearly did not follow the dictates of L.R. 56.1, or attempt to comply with the spirit of the rule. Nevertheless, the Defendants did make a reply to Bailey's statement of the facts by numbering the sentences, then making the appropriate objection or response by numbered paragraph. Defs.' Reply To Pl.'s Add'l Mat'l Facts And Mot. To Strike at 3–21.

As stated by the Seventh Circuit, L.R. 56.1 "serve[s] to notify the parties of the factual support for their opponent's arguments, but more importantly inform the court of the evidence and arguments in an organized way—thus facilitating its judgment of the necessity for trial." *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir.1995). Furthermore, "a party contesting summary judgment has a responsibili-

ty under [rules such as L.R. 56.1] to 'highlight which factual averments are in conflict as well as what record evidence there is to confirm the dispute.' " *Id.* (quoting *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir.1994)).

By not following the requirements of L.R. 56.1, Bailey has made it difficult for this Court to determine whether there are issues of material fact in dispute. Such a situation does not favor Bailey because, as the non-movant, he bears the burden of coming "forward with evidence that would reasonably permit the finder of fact to find in [his] favor on a material question" and if the Court cannot easily find such evidence, the Defendants may win easily. *Waldridge*, 24 F.3d at 920. *Accord Liu v. T & H Machine, Inc.*, 191 F.3d 790, 796 (7th Cir.1999); *Adler v. Glickman*, 87 F.3d 956, 958 (7th Cir.1996).

In addition, under L.R. 56.1, Bailey is required to make an "effort to identify with specificity what factual issues were disputed, ... [and] supply the requisite citations to the evidentiary record." *Waldridge*, 24 F.3d at 922. Here, Bailey failed to "identify with specificity" the facts in dispute, depending instead upon the Court or, as it happens, the Defendants, to point out where factual disputes lie. It is impossible to tell from Bailey's version of the facts which facts are uncontroverted and which are contested. Without the Defendants' objections to individual sentences in the statement of facts contained in Bailey's brief, this Court would have no choice but to accept Defendants' version of the facts as uncontroverted. But, because the Defendants in this case chose to make a detailed response to the facts offered by Bailey, in appropriate form, some of Bailey's proffered facts will survive.

However, the Court will only consider those facts that Bailey presents in his brief for which he provides proper citation to evidence of the kind designated by Federal Rule of Civil Procedure 56(c). Facts that Bailey submits without proper citation to submitted evidence are stricken. Accordingly, the facts of this case in the light most favorable to Bailey follow.

Bailey was born on December 30, 1938 and joined the Muncie Police Department ("MPD") on January 27, 1970 at the age of 32. *See* Bailey Dep. at 13–14; Hargis Aff., Letter from Cordell Campbell, Pres. Police Pension Bd., to Muncie Police and Fire Merit Comm. (the "Commission"). Generally, Bailey's performance at the department was rated as satisfactory or above satisfactory for the period between 1970 to 1994. *See* Weller Aff. To Authenticate Bus. Rec. (hereinafter "Weller Aff. I"), Bailey Job Perf. Reviews. In addition, at least one direct supervisor described Bailey's work as average or above average, and other supervisors who had occasion to observe Bailey's work also deemed it as such. *See* Davis Aff. ¶ 9; *see also* Denney Aff. ¶ 5; McClellan Aff. ¶ 4; Williams Aff. ¶ 5. Further, although Bailey received a few reprimands for misconduct during his career, he also received commendations for work on particular cases. Weller Aff. I, Bailey Reprimands & Commendations.

Sometime in 1996, a captain in the department, and apparently others of similar rank, learned at staff meetings of Chief Winkle's desire to transfer older officers to less desirable positions and replace them with younger officers.[2] Davis Aff. ¶ 7; McClellan Aff. ¶¶ 5–6. In addition, Chief Winkle referred to older officers on the force as "dead wood," "dead weight," or "lazy." [3] Davis Aff. ¶¶ 5, 6. Upon hearing about Chief Winkle's alleged plan, Bailey and fellow officer Sergeant Jan McClellan ("McClellan"), visited Mayor Canan to express their concern about it.[4] McClellan

---

2. Defendants admit this fact for purposes of this summary judgment motion only. Defs.' Reply To Pl.'s Add'l Mat'l Facts And Mot. To Strike at 13.

3. Defendants admit this fact for purposes of this summary judgment motion only. Defs.' Reply To Pl.'s Add'l Mat'l Facts And Mot. To Strike at 10–11.

4. Defendants admit this fact. Defs.' Reply To Pl.'s Add'l Mat'l Facts And Mot. To Strike at 9.

Aff. ¶¶ 5–6. Mayor Canan indicated to the officers that he understood their concerns and would take care of the situation. *See id.* ¶ 7. Soon after that, Bailey openly challenged Chief Winkle about the plan in a department meeting.[5] Bailey Dep. at 27.

At the time of these events, Bailey held a detective position on the MPD in which he investigated "forgeries, stolen checks, [and] anything to do with stolen and forged credit cards." Bailey Dep. at 24–25. He had held this position for approximately two years prior to December 1996. Bailey Dep. at 13–14. In December 1996, Bailey was fifty-eight years old. *Id.* at 24–25. It was with this backdrop that the incidents occurred that led to Bailey's ten day suspension and subsequently his retirement.

On the morning of December 3, 1996, Bailey and fellow police officer, Michael McDonald[6] ("McDonald"), both wearing plain clothes, left the Muncie Police Station (the "Station") in Bailey's assigned, unmarked police car to get breakfast. Bailey Dep. at 13, 135–37; Bailey Statement at 2, 14–16. Bailey and McDonald heard a "be on the lookout" ("BOL") call over the police dispatch radio in the car on their way to breakfast. Bailey Dep. at 13; Bailey Statement at 2. Bailey heard MPD Officer Craig ("Craig") report that he had spotted a person named Danny Fletcher ("Fletcher"), who had recently been released from jail, was armed with an automatic weapon and had threatened to kill his ex-girlfriend, in the area of First Street and Kilgore. Bailey Dep. at 13–14; Bailey Statement at 2. Bailey and McDonald were near the intersection in question, and when they arrived there, they saw Craig's marked patrol car with its lights and siren on in high-speed pursuit of Fletcher. Bai-

ley Statement at 3. Bailey and McDonald joined the pursuit, in part because Bailey knew Fletcher and Bailey thought he could help diffuse the situation with Fletcher. *Id.* at 2, 15; Bailey Statement at 7.

However, Bailey and McDonald failed to inform MPD dispatch that they were joining Craig. Bailey Statement at 5; Weller Aff. I, MPD Internal Investigation Report No. 96–51974 (Dec. 11, 1996), at 1 (hereinafter "Int.Invest.Rep."); Weller Aff. I, Letter from Chief Winkle and Deputy Chief Terry W. Winters to Sgt. Donald R. Bailey, Feb. 11, 1997 (hereinafter "Feb. 1997 Letter"). Apparently, this failure is a violation of the MPD rules and regulations regarding "Signal 10 Runs" and "Emergency Operation of Police Vehicles."[7] Weller Aff. I, Policies & Procedures Nos. 86–9–22–055, 86–9–22–063 (hereinafter "MPD Pol. & Ps."); Feb.1997 Letter. Nevertheless, Bailey and McDonald continued in pursuit of Fletcher, following Craig, outside the Muncie city limits, through Yorktown and Daleville and onto Interstate Sixty–Nine ("I–69"). Bailey Dep. at 15; Feb.1997 Letter at 2. By the time Fletcher and his pursuers were heading outside Muncie, other state, county and local law enforcement officials had joined the pursuit. Bailey Statement at 5; Weller Aff. I, James Peters' Statement to Detective Brian Buroker, Indiana State Police Dep't (hereinafter "Peters' Statement") at 6; Int.Invest.Rep. at 2; Feb.1997 Letter at 2. After the pursuit had gone through Daleville, Sergeant Jim Peters ("Peters") issued an order over the police radio system that all police cars, except for officers Craig and Mench ("Mench"), should discontinue the pursuit. Peters' Statement at 6; Int.Invest.Rep. at 1; Feb.1997 Letter at 2. However, Bailey

---

**5.** Defendants admit this fact for purposes of this summary judgment motion only. Defs.' Reply To Pl.'s Add'l Mat'l Facts And Mot. To Strike at 8.

**6.** Officer McDonald was born on May 21, 1957 and began his service to the MPD on July 21, 1991. Weller Aff. II ¶ 4. Thus, on December 3, 1996, McDonald was 39 years

old and had served on the police force for approximately five and a half years.

**7.** Bailey disputes that anything he did during the Fletcher pursuit and stand-off were in violation of MPD policies or procedures, yet he offers no evidence to controvert the findings of the MPD.

did not hear the order because he had inadvertently turned his radio off when he began the pursuit.[8] Bailey Dep. at 82; Bailey Statement at 4. Bailey's failure to have his radio on in this circumstance was considered by his management and his fellow police officers as negligent and in violation of MPD rules and regulations. MPD Pol. & Ps. Nos. 86–9–22–055, 86–9–22–063; Feb.1997 Letter.

At some point during the continued chase, Bailey's car became the lead car in pursuit of Fletcher. Bailey Statement at 5; Peters' Statement at 7. Even though Peters had issued an order over the radio that officers should not fire their weapons at Fletcher's car, McDonald failed to heed this order, and with Bailey's knowledge, and apparently consent, McDonald leaned out the car window, while the vehicle was moving at high speed, and fired at least one shot at Fletcher's car. Bailey Statement at 8, 10; McDonald Statement at 8, 14; Int.Invest.Rep. at 8, 10. After McDonald fired the shots, Bailey attempted to maneuver his car in front of Fletcher's vehicle in order to slow Fletcher down and at one point the two cars collided, but did not stop. Bailey Statement at 11; McDonald Statement at 11; Int.Invest.Rep. at 1, 3. Officers also used stop sticks in an attempt to disable Fletcher's vehicle. Bailey Statement at 9; Peters' Statement at 10; Breena Wysong Aff. To Authenticate Bus. Recs., *Muncie Man Kills Self After I–69 Chase*, The Star Press, Dec. 4, 1996, at 1A (hereinafter "Star Press Article"). Fletcher continued driving, however, until he reached a rest area at which he stopped; the pursuing police also stopped and surrounded Fletcher's vehicle. Bailey Dep. at 15; Bailey Statement at 9.

Several of Bailey's and McDonald's actions during the chase were considered by MPD management and MPD internal investigation officers as violations of MPD rules and regulations; some of them were considered violations of direct orders by a superior officer. MPD Pol. & Ps. Nos. 86–9–22–055, 86–9–22–063; Int.Invest.Rep. at 1–2; Feb.1997 Letter at 1–5.

Once at the rest area, Bailey pulled his car up very close to Fletcher's car before contacting his supervisors or other law enforcement officials on site to discuss the appropriate tactical approach. Bailey Statement at 13–14; Peters' Statement at 12; Int.Invest.Rep. at 3; Feb.1997 Letter at 3. Shortly after parking his car, Bailey exited the vehicle and walked up to Fletcher's car. Bailey Dep. at 15; Int.Invest.Rep. at 2; Feb.1997 Letter at 3. When he reached Fletcher's vehicle, Bailey noticed that Fletcher was pointing a shot gun to his own chest. Bailey Statement at 14–15. Bailey began talking with Fletcher trying to convince him to put the shot gun down and surrender. Bailey Dep. at 17; Bailey Statement at 14–15. Apparently, during the discussion, Bailey watched Fletcher consume pills that made Fletcher drowsy, shook Fletcher awake when he fell asleep, and returned the car's keys to Fletcher after Fletcher had voluntarily thrown them out of the car. Bailey Dep. at 17, 158–59; Bailey Statement at 15–16; Int.Invest.Rep. at 2, 3. These acts were considered by MPD management as in poor judgment. Feb.1997 Letter at 2. The standoff ended when Fletcher shot himself in the chest. Bailey Dep. at 17–18; Feb. 1997 Letter at 2. Bailey then reached into Fletcher's car, grabbed the gun and threw it butt first to the ground, which could have caused the weapon to fire a second time. Bailey Dep. at 18; Bailey Statement at 18–19; Int.Invest.Rep. at 2.

Bailey was stunned and in shock following the incident. Bailey Dep. at 18–19; Int.Invest.Rep. at 3–4. Craig drove Bailey and McDonald back to Muncie City Hall at approximately 10:39 a.m. Bailey Dep. at 4–6; Weller Aff. I, Jack Craig Supplemental Police Rep. (hereinafter "Craig Rep.").

---

**8.** In contrast to this statement made by Bailey, during investigation of the Fletcher chase, McDonald recalled hearing a lot of "radio traffic." Weller Aff. I, Michael McDonald Statement to Detective Brian Buroker, Indiana State Police Dep't at 4, 10 (hereinafter "McDonald Statement"). This factual dispute is not dispositive on the issues of this case.

Once the officers arrived at City Hall, the Indiana State Police and the MPD interviewed Bailey and McDonald about the incident. Bailey Statement at 1; McDonald Statement at 1; Weller Aff. I, Bailey Garrity Warning (hereinafter "Bailey Garrity"); Weller Aff. I, McDonald Garrity Warning (hereinafter "McDonald Garrity").

Even though it seemed to Bailey that he was interviewed about the incident immediately following the event, *see* Bailey Dep. at 20, the Indiana State Police interviewed Bailey at approximately 2:12 p.m. Bailey Statement at 1. When that interview concluded, Bailey was interviewed by the MPD. Bailey Garrity. Bailey was advised that the MPD interview was for the purpose of "administrative matters relating to the official business of the MPD" and not for the "purpose of instituting a criminal action against [him]." *Id.* Although advised of his right to consult with an attorney before questioning, Bailey did not make such a request. *Id.*

The Indiana State Police interviewed McDonald after Bailey at approximately 3:27 p.m. McDonald Statement at 1. However, the MPD interviewed McDonald at approximately 11:07 a.m. McDonald Garrity. Like Bailey, McDonald was also advised that the interview was for the purpose of "administrative matters relating to the official business of the MPD" and not for the "purpose of instituting criminal action against [him]," and that he had the right to talk with an attorney before making his statements. *Id.* McDonald consulted an attorney before answering any questions. *Id.*

On the day following the Fletcher chase, McDonald was told to report to Chief Winkle's office to discuss McDonald's disregard of Peters' orders during the Fletcher

chase. Weller Aff. I, Letter from Chief Joseph R. Winkle to Michael A. McDonald, Dec. 4, 1996. At the meeting, McDonald was suspended for ten days for disregarding the orders. Weller Aff. I, Letter from Chief Joseph R. Winkle to Michael A. McDonald, Dec. 5, 1996. He was also informed that further disciplinary action might be warranted depending upon the results of the ongoing internal investigation into the incident. *Id.* After the investigation, Chief Winkle suggested to the Commission that McDonald be fired. Weller Aff. I, Letter from Chief Joseph R. Winkle to Michael J. Szakaly, Feb. 6, 1997 (hereinafter "McDonald Termination Letter"). After a hearing on the issue, the Commission accepted Chief Winkle's recommendation. Hargis Aff., Minutes of the Muncie Police/Fire Merit Commission Meeting, Oct. 16, 1997, at 2.

On the day following the Fletcher chase, December 4, 1996, Chief Winkle ordered Bailey to report for a "Fitness for Duty Evaluation" on December 6, 1996, and placed Bailey on administrative leave until Chief Winkle could evaluate the psychologist's report. Weller Aff. I, Letter from Chief Winkle to Sgt. Donald Bailey, Dec. 4. On December 5, 1996, Bailey visited his own doctor, who issued a note that Bailey was to remain off work until the doctor gave him permission to return. Weller Aff. I, Note from Dr. James L. Dunn, Dec. 5, 1996.

About a week after the Fletcher chase, Bailey returned to the office. *See* Bailey Dep. at 101, 115. That day Chief Winkle orally informed Bailey that the investigation into the incident was not complete, however, Bailey could probably expect some suspension time.[9] *See* Bailey Dep. at 106, 116. Bailey decided at that point that he would retire rather than go through a

---

**9.** There is a discrepancy in Bailey's testimony about exactly what Chief Winkle told him at this informal meeting. At one point in his deposition Bailey testified that Chief Winkle told him to expect a two or three day suspension. Bailey Dep. at 106. However, in another part of his deposition, Bailey testified that Chief Winkle told him he was facing a

ten day suspension and a hearing in front of the merit commission. Bailey Dep. at 116. In his statement of the facts, Bailey said: "While on medical leave and upon learning of [Chief] Winkle's intention to suspend him for ten (10) days, Bailey requested that his retirement papers be drawn up."

suspension and a potential merit commission review. *See* Bailey Dep. at 116. Bailey talked with MPD Administrative Captain Weller ("Weller") about retirement and at the same meeting asked Weller to draft the papers necessary to effectuate the retirement. Weller Aff. II ¶¶ 6–8. A few days later, however, Bailey changed his mind, and the MPD allowed him to withdraw his retirement papers. Bailey Dep. at 116; Weller Aff. II ¶¶ 8–11.

Bailey returned to work on January 2, 1997. *See* Bailey Dep. at 57, 117. However, on January 8, 1997, Bailey presented two notes from his doctor stating that Bailey should not work for an indefinite period of time. Weller Aff. I, Prescription Notes, Jan. 8, 1997 (hereinafter "Doctor's Notes"). Upon inquiry by the MPD, Bailey's doctor, Dr. James L. Dunn ("Dr. Dunn"), provided further explanation that Bailey was suffering from situational anxiety, depression and hypertension. Weller Aff. I, Letter from Dr. James L. Dunn to Captain Baird Davis, Jan. 9, 1997 (hereinafter "Doctor's Letter I"). Dr. Dunn recommended that Bailey not return to work until at least January 28, 1997, at which time the doctor would reevaluate the situation. *Id.* Dr. Dunn signed a release for Bailey to return to work part-time on January 27, 1997. Weller Aff. I, Letter from Dr. James L. Dunn to Captain Baird Davis, Jan. 27, 1997 (hereinafter "Doctor's Letter II").

On January 28, 1997, Terri Rickel ("Rickel"), First Vice President, American National Bank in Muncie, and others met with Chief Winkle on behalf of the Community Financial Institutions Security Committee ("CFISC") to discuss the MPD's response to bank alarms and check fraud cases. Rickel Aff. ¶¶ 9–10, 15–16; Rickel Aff.Ex. D; Utt Aff. ¶¶ 11–12; Winkle Aff. ¶¶ 4–6. During the meeting, Rickel told Chief Winkle that CFISC's member banking institutions were concerned about the attention Bailey was paying to their check fraud cases. Rickel Aff. ¶¶ 17–18; Winkle Aff. ¶¶ 7–8. Rickel requested that Chief Winkle rectify the situation with Bailey. Rickel Aff. ¶ 19; Utt Aff. ¶ 14; Winkle Aff. ¶ 9. Immediately thereafter, Winkle removed Bailey from the check fraud investigation position and replaced him with Officer Steve Bell ("Bell"). Winkle Aff. ¶ 10. Bell was younger than Bailey.[10] *See id.* at 56–58; Weller Aff. II ¶ 5. After the switch, CFISC members were satisfied with Bell's work. Rickel Aff. ¶ 21; Utt Aff. ¶ 16.

When Bailey reported to work after his medical leave,[11] he found out about his reassignment to the general investigation area of the detective division. *See* Bailey Dep. at 117. Even though this was a different assignment, Bailey testified that he did not mind the change. Bailey Dep. at 118. In addition, the change did not affect Bailey's rank, hours, pay, seniority or benefits. Weller Aff. II ¶¶ 13–14.

Although he was back at work, Bailey perceived that he was being harassed.[12]

---

**10.** Bailey offered this fact without proper citation to the record. *See* Pl.'s Br. In Opp. To Defs.' Mot. For Summ.J. at 3. Defendants admitted this fact, while objecting to Bailey's proffer without proper citation, and in addition, included Bell's birth date and his age when he assumed the check investigations duty in their own statement of the facts. Defs.' Reply to Pl.'s Add'l Mat'l Facts and Mot. To Strike at 18; Defs.' Br. In Supp. Of Mot. For Summ.J. at 116. The Court finds the statement here is a reasonable inference drawn from the facts provided by the Defendants.

**11.** There is no specific date in the record for Bailey's return to work. The Defendants

point to an attendance record submitted as a business record with Weller's affidavit, however, that document bears no designation of the year it records. In addition, the document has codes in the boxes underneath the numbers corresponding to the days of the months, however, the codes do not correspond to the key on the same page. Thus, the document's contents is not decipherable by the Court, therefore, the Court will not use this document in deciding this motion.

**12.** This statement comes from the evidence that Bailey cites for his "factual statement," that "In this capacity [ (as general investigator after medical leave) ] Bailey continued to experience harassment." The Defendants

Bailey Dep. at 118–121. Specifically, Bailey's superiors challenged his long-term customary dress code and his long-term routine work habits and also accused Bailey of a variety of work rule violations. Bailey Dep. at 31, 118–121. Bailey recalled several specific incidents where a Lieutenant Irelan made the reprimands. *Id.* at 118–121.

In early February 1997, the MPD internal affairs team completed its investigation of the Fletcher chase. Winkle Aff. ¶ 12. Chief Winkle reviewed the report and recommended to the Commission on February 6, 1997, that it terminate McDonald's employment with the department. Winkle Aff. ¶ 12; McDonald Termination Letter.

In contrast, on February 10, 1997, Chief Winkle issued a written order to Bailey requiring him to appear in Chief Winkle's office the next day to discuss disciplinary action related to the Fletcher chase. Weller Aff. I, Letter from Joseph R. Winkle to Sgt. Donald R. Bailey, Feb. 10, 1997 (hereinafter "Feb.1997 Order"). The order informed Bailey that he had the right to bring a representative from the Fraternal Order of Police ("FOP") to the meeting with him in accordance with the collective bargaining agreement between the FOP and the City. *Id.* Bailey appeared in Chief Winkle's office with his chosen representative at the appropriate time. Bailey Dep. at 110. During the meeting, Chief Winkle suggested to Bailey that if he was still planning to retire, then disciplinary action against him, including suspension and a Commission hearing, would be moot. Bailey Dep. at 88; Winkle Aff. ¶ 17. Bailey responded that he had not decided whether he was going to retire. Winkle Aff. ¶ 18. Then, Chief Winkle told Bailey about the outside pressures that would require him to make some type of disciplinary recommendation to the Commission. *Id.* ¶¶ 4, 15–16. Those pressures included the seriousness of the findings by the internal investigation team, the public

criticism of the MPD's handling of the Fletcher chase, and the City's concern about the possibility of a wrongful death action by Fletcher's family. *Id.* ¶¶ 14–15. Chief Winkle also read to Bailey the formal letter describing the errors Bailey made during the Fletcher chase and the MPD policies and procedures that Bailey violated during the incident. Bailey Dep. at 114; Winkle Aff. ¶ 21; Feb.1997 Letter. The letter informed Bailey that he was suspended for ten days without pay for his actions. Feb.1997 Letter. In addition to the letter of suspension, Chief Winkle also read to Bailey the letter he was submitting to the Commission recommending that Bailey's rank be reduced from sergeant to patrolman. Winkle Aff. ¶ 20; Weller Aff. I, Letter from Joseph R. Winkle to Michael J. Szakaly, Feb. 11, 1997 (hereinafter "Bailey Demotion Letter"). Chief Winkle asked Bailey if he had any questions, Bailey said no, then left the meeting without comment. Bailey Aff. at 114.

Once Bailey had returned to work after his suspension, by letter dated February 28, 1997, the Commission notified Bailey that it would hold a hearing on March 26, 1997 to consider his conduct during the Fletcher chase. Hargis Aff., Letter from Mike Szakaly to Donald Bailey, Feb. 28, 1997 (hereinafter "Hearing Notice"). On March 21, 1997, the Delaware Superior Court issued a temporary restraining order against the Commission to prevent it from conducting the disciplinary hearing. Hargis Aff.Ex. E. Apparently, the temporary restraining order was granted because the Commission's Hearing Notice did not give Bailey fair notice of the claims against him. Weller Aff. II ¶ 23. Subsequently, the MPD drafted a more thorough description of Bailey's violations of MPD policies and procedures and disciplinary action by the Commission resumed. Weller Aff. I, Letter from Chief Joseph R. Winkle to Michael J. Szakaly,

point out that Bailey's statement in his brief is not a statement of fact, but rather a legal conclusion. However, that Bailey felt he was harassed is not a legal conclusion and can be

found in the evidence Bailey cites to for the statement he gave. *See* Bailey Dep. at 121, *ls.* 14–15 ("It was more retaliation, more harassment.").

**978**

Apr. 21, 1997 (hereinafter "Revised Charges"); Weller Aff. II ¶ 25.

Then, in early July 1997, Captain Anthony R. Mench ("Mench"), told Bailey that the Delaware County Prosecutor's Office had complained about how Bailey had handled evidence and prepared to testify in a trial. Bailey Dep. at 183–86; Weller Aff. I, Letter from Captain Anthony R. Mench to Chief Joe Winkle, July 4, 1997. Bailey felt this was the "last straw" in a continued pattern of harassment. Bailey Dep. at 184–85. In fact, Bailey protested to Mench that the MPD was trying to get rid of "older officers," then Bailey informed Mench of his intention to retire. Mench Aff. ¶¶ 8–9; Bailey Dep. at 185. When he left Mench's office, Bailey went to Weller's office to request that the Captain prepare his retirement papers. Bailey Dep. at 188. Bailey's last day of work at the MPD was July 7, 1997. Weller Aff. I, Letter from Donald R. Bailey to Chief Joseph R. Winkle, July 7, 1997 (hereinafter "Retirement Letter"). Subsequently, all charges against him pending at the Commission were dropped. Hargis Aff., Minutes of Muncie Police/Fire Merit Commission Meeting, Oct. 2, 1997. Having recited the facts of this case, the Court will now turn to the application of the law to these facts.

### B. ADEA Claim

Bailey has brought his claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34. The ADEA is designed "to promote employment of older persons based on their ability rather than age[, and] to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621(b). Specifically, the ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual ... because of such individual's age" and "to limit, segregate, or classify employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." Id. §§ 623(a)(1)–(2). However, it is not "unlawful for an employ-

er ... to take any action otherwise prohibited ... [in] this section where age is a bona fide occupational qualification ... or where the differentiation is based on reasonable factors other than age...." Id. § 623(f)(1).

Originally the ADEA did not apply to state and local government employers, however, in 1974 Congress modified the definition of employer to include such entities. See Johnson v. Mayor & City Council of Baltimore, 472 U.S. 353, 356, 105 S.Ct. 2717, 86 L.Ed.2d 286 (1985) (citing 29 U.S.C. § 630(b)); Kopec v. City of Elmhurst, 193 F.3d 894, 896–97 (7th Cir.1999); Roche v. City of Chicago, 24 F.3d 882, 883 (7th Cir.1994). In a recent Supreme Court decision, the Court held that "in the ADEA, Congress did not validly abrogate the States' sovereign immunity to suits by private individuals." Kimel v. Florida Bd. of Regents, —— U.S. ——, 120 S.Ct. 631, 658, 145 L.Ed.2d 522 (2000). In making this determination, the Court applied the "congruence and proportionality" test first articulated in City of Boerne v. Flores, 521 U.S. 507, 520, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Id. at 643. The Court reasoned that the ADEA "through its broad restriction on the use of age as a discriminating factor, prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection, rational basis standard." Id. at 647. Moreover, "Congress had virtually no reason to believe that state and local governments were unconstitutionally discriminating against their employees on the basis of age[,]" therefore, there was "no reason to believe that broad prophylactic legislation was necessary in this field." Id. at 649. Thus, it appears that this Court does not have jurisdiction to decide Bailey's claim of age discrimination against the City.

If the Court did have such jurisdiction, to state an individual claim for age discrimination under the ADEA, plaintiffs must offer direct evidence of discrimination, or use the indirect, burden-shifting,

method of proof described in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Testerman v. EDS Tech. Prods. Corp.,* 98 F.3d 297, 301 (1996). Using the direct method, a plaintiff may prove discrimination by providing evidence that the factfinder may interpret as the employer's acknowledgment of discriminatory intent. *See Chiaramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391, 396 (7th Cir.1997). For it to succeed, such evidence must clearly demonstrate the motivation of the person who made the contested employment decision. *See id.* (citing *Cheek v. Peabody Coal Co.,* 97 F.3d 200, 203 (7th Cir.1996)). For an individual age discrimination claim, a plaintiff must prove that age was the determining factor in that decision. *See id.; Testerman,* 98 F.3d at 301.

 If an employee cannot provide direct evidence of discrimination, he or she may adopt the traditional burden-shifting method of proof first articulated in *McDonnell Douglas,* and refined in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Although this framework was originally applied only to Title VII claims, it has been adapted to age discrimination claims under the ADEA. *See McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 371 (7th Cir.1992) (quoting *Oxman v. WLS–TV,* 846 F.2d 448, 452 (7th Cir.1988)). Ordinarily, in an ADEA case, this approach· is based on the legitimate assumption that the plaintiff was doing fine in his or her job, then lost it, and was replaced by someone younger. *Hartley v. Wisconsin Bell, Inc.,* 124 F.3d 887, 889 (7th Cir.1997). An employee may establish a prima facie case by showing:

1. Membership in a protected age group;
2. Satisfactory job performance;

3. An adverse employment action, such as a discharge; and
4. That substantially younger, similarly-situated employees were treated more favorably.

*Chiaramonte,* 129 F.3d at 398 (citing *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996)).

 By establishing these elements of a prima facie case of age discrimination, the employee will enjoy a rebuttable presumption of discrimination that shifts the burden of production to the employer to articulate "a legitimate, nondiscriminatory reason" for the adverse employment action.[13] *See Testerman,* 98 F.3d at 302 (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089). " '[T]he defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Hicks,* 509 U.S. at 507, 113 S.Ct. 2742 (quoting *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089) (alteration in original). However, the ultimate burden of persuasion on the issue of intentional discrimination remains with the plaintiff. *See id.; Testerman,* 98 F.3d at 303. If the employer succeeds in providing evidence of a nondiscriminatory reason for the adverse action, the presumption dissolves and the burden of production shifts back to the plaintiff " 'to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination.' " *Testerman,* 98 F.3d at 302–03 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089). *See also Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1122 (7th Cir.1994).· To demonstrate pretext, "a plaintiff must show more than that the employer's decision was incorrect; the

---

**13.** The *McDonnell Douglas* presumption is only a "procedural device" intended to establish an order of proof and production, not a means of deciding the merits. *Hicks,* 509 U.S. at 521, 113 S.Ct. 2742.

plaintiff must also show the employer lied about its proffered explanation." *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir.1998). Poor judgment on the part of the employer does not suffice. *Id.*

■ Some ADEA plaintiffs may choose to provide evidence that the employer made the adverse employment decision for "mixed motives," or for both legitimate and discriminatory reasons. *See id.* at 369; *see also Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1140 (7th Cir.1997) (describing mixed motive under Tide VII analysis). Under the mixed motive theory, an employee may rely on either direct or circumstantial evidence to establish discriminatory intent. *See Abioye*, 164 F.3d at 369 (citing *Gleason*, 118 F.3d at 1140). "The defendant employer may then avoid a finding of liability by proving that it would have made the same decision even if the plaintiff was not ... above a certain age." *Id.* (citing *Gleason*, 118 F.3d at 1140). An employee must provide more than "some" evidence of a discriminatory motive to overcome overwhelming evidence of a "'wholly legitimate reason for the employment decision.'" *Id.* (quoting *Trahant v. Royal Indemnity Co.*, 121 F.3d 1094, 1098 (7th Cir.1997)).

Bailey claims that the City discriminated against him because of his age in four instances: 1) when the City reassigned him to general investigator and replaced him with a younger employee; 2) when the City suspended him for ten days after the investigation of the Fletcher incident; 3) when the City recommended to the Commission that it demote Bailey; and 4) when the City forced him to retire as a result of the harassment and false charges of misconduct against him.

The City makes varied arguments as to each alleged adverse action, therefore, the Court will discuss each of Bailey's assertions and the City's arguments in turn.

■ **1. Reassignment to General Investigator.**—The City argues that Bailey's transfer, as a purely lateral move that did not affect his rank, salary or other job criteria, does not rise to the level of an adverse action. Therefore, Bailey cannot seek relief under the ADEA for that action. The Court agrees.

The ADEA only forbids discriminatory acts against an individual "with respect to his compensation, terms, conditions, or privileges of employment," or acts by an employer that limit, segregate, or classify "employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee." *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 273 (7th Cir.1996). In other words, to establish a *prima facie* case, Bailey must establish that the action taken by the City was adverse. Bailey has failed to establish this element.

■ A purely lateral transfer, or one "that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do either." *Id.* at 274 (citing *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 456–57 (7th Cir.1994): *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132 (7th Cir.1993); *Spring v. Sheboygan Area School Dist.*, 865 F.2d 883 (7th Cir. 1989)). Bailey's transfer from one area of detective work to another, standing alone, is simply not adverse. In addition, there is no indication in the record that Bailey's responsibilities as a detective changed in a material way. His rank, hours, pay, seniority, and benefits remained the same. Weller Aff. II ¶¶ 13–14. The facts reflect that the transfer changed only the types of cases Bailey worked on.

In fact, the change in job that Bailey experienced does not rise to the level of change experienced by an employee in another case in which the Seventh Circuit found no adverse employment action. *See Williams*, 85 F.3d at 274. In *Williams*, a pharmaceutical salesperson was transferred from one division to another, selling a completely different product line. *Id.* at 272. The change affected his sales and

correspondingly, his commission pay. *Id.* at 272, 274. The Seventh Circuit found this change did not rise to the level of an adverse employment action, even with the change in commission pay, because it was a purely lateral transfer and the lower sales also hurt the employer. *Id.* at 274. Bailey cannot even argue that the change in his responsibilities changed his pay or any other material aspect of his job. In addition, Bailey himself admitted that he did not have a problem with the change. *See* Bailey Dep. at 118. Under these circumstances, it is stretching the definition of "adverse" too far to consider Bailey's transfer to the general investigation area an adverse employment decision.

**■ 2. Ten Day Suspension.**—The City argues that it had legitimate, non-discriminatory reasons for suspending Bailey for ten days after its investigation of the Fletcher chase. The reasons it offers include the severity of the findings of the internal investigation team, the number of procedural violations Bailey committed during the Fletcher incident, the public criticism of the MPD for how it handled that event, and the possibility of a wrongful death suit against the City by Fletcher's family.

Bailey asserts that the City's willingness to drop the formal charges against him in exchange for his retirement creates a genuine issue of material fact on the question of whether the charges were as serious as the City alleges. His retirement, Bailey argues, would not change public perception or change the City's potential liability. Therefore, there is a genuine issue of material fact, he asserts, on whether the City's suggestion of retirement was pretext for age discrimination.

Although the repeated and continual suggestion of retirement in lieu of termination in other cases has sufficed to rebut an employer's articulated legitimate, non-discriminatory reason for a termination, *see Greenberg v. Union Camp Corp.,* 48 F.3d 22, 28–29 (1st Cir.1995); *Sischo-Nownejad v. Merced Comm. College Dist.,* 934 F.2d 1104, 1108, 1112 (9th Cir.1991), the suggestion of retirement and the drop of the charges, without more, can not rebut the City's evidence of a legitimate non-discriminatory reason for Bailey's suspension. There is no dispute here that Chief Winkle asked Bailey if he had considered retirement. Chief Winkle stated by affidavit that he did so to spare Bailey the embarrassment of a suspension, Commission hearing, and potential demotion. Winkle Aff. ¶¶ 16–18. The Seventh Circuit has recognized that this is a legitimate reason for suggesting retirement without evidence that "the identified deficiency in [the employee's] work performance was pretextual." *Kaniff v. Allstate Ins. Co.,* 121 F.3d 258, 263 (7th Cir.1997). Bailey offers no evidence that the deficiencies found by his peers during the investigation of the Fletcher incident were illegitimate. Moreover, Bailey does not offer facts that imply that a suspension was not warranted based on the findings of the internal investigation team or in some other way offer alternative facts that rebut those findings.

Further, Bailey does not point to facts that would lead to an inference that the City's concerns about public perception or a lawsuit was pretext for discrimination on account of his age. Nor does Bailey point to facts that suggest those reasons were not legitimate ones on which the City should base its decision about a suspension or reduction in rank. Finally, the fact that the charges before the Commission were dropped against him after he retired does not tend to suggest that the deficiencies his peers identified were not serious. What it does reflect is common sense because the issue was moot since Bailey no longer worked for the MPD. Further, the seriousness of the charges are reflected in the Commission's action to proceed with its case after Bailey had obtained a temporary restraining order. Rather than dropping the charges then, it provided a more detailed hearing notice and rescheduled the hearing. These actions suggest that the Commission viewed the charges as sufficient enough to warrant a hearing about the correct disciplinary action to take.

In addition, McDonald, a younger worker, received the same suspension for his violation of similar department regulations, which supports the City's decision to give the same suspension to Bailey. The City had a legitimate, non-discriminatory reason for suspending Bailey for ten days that Bailey has not rebutted with evidence of pretext.

**3. Recommendation to Commission of Reduction in Rank.**—The City argues that the nature and severity of Bailey's misconduct during the Fletcher incident warranted its referral to the Commission. In addition, the recommended penalty for Bailey's misconduct was less severe than that recommended for McDonald's misconduct during the same incident, further supporting the City's assertion of a legitimate, non-discriminatory reason for its actions.

In rebuttal, Bailey argues that the fact the charges against him were dropped after he retired creates a material issue on the question of whether the charges were severe enough to warrant such a referral. Further, Bailey asserts McDonald was disciplined and suspended on more than one occasion by the MPD, therefore, whether his situation could be compared to that of McDonald is a material issue of fact that warrants a jury trial.

Bailey's arguments fail for the simple reason that he offers no additional facts that suggest the City lied about its reasons for recommending a reduction in his rank. As discussed above, the fact that the City dropped the charges against him after his retirement does not call into question the severity of Bailey's misconduct. Once Bailey retired, the charges against him became moot. Further, Bailey offers no facts in rebuttal about the actual charges against him. According to the letter he was given by Chief Winkle describing his misconduct, Bailey violated fourteen different MPD rules, policies or procedures during the Fletcher incident. Feb.1997 Letter. In addition, the internal investigators stated that Bailey had endangered his own life as well as that of others by not following police procedure. Int.Invest.Rep. at 2–5. Bailey offers no evidence that would rebut the "seriousness" of such charges by his peers. All of Chief Winkle's decisions were based upon the findings of the internal investigation. The only testimony that contradicts the findings of the internal investigation team is Bailey's own self-serving and conclusory statements that the charges against him were unfounded. Moreover, Bailey presents no evidence or even alleges facts to discredit the findings of the internal investigation team. Those findings clearly indicate that Bailey failed to follow many MPD procedures and in fact endangered his own life as well as those of other officers.

Finally, Bailey's assertion that comparing him to McDonald is inappropriate cannot succeed. Bailey has no direct evidence that the decision to recommend a demotion was based on age. Therefore, Bailey must provide indirect evidence of discrimination. To establish a prima facie case by circumstantial proof, Bailey must assert that a younger employee was treated differently in similar circumstances. *See Chiaramonte*, 129 F.3d at 398 (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996)). The most logical comparison to make in this case, where both Bailey and a younger officer were involved in the relevant incident, is a comparison between Bailey and that younger officer. Certainly other considerations, such as additional suspensions for each person is relevant, however, Bailey offers no relevant evidence on this point for either himself or McDonald.[14] In addition, the fact that Bailey was treated more favorably than

14. Bailey offered a summary of the suspensions in the MPD for the years 1992 to 1998 in support of this statement. However, the Court cannot determine from the document entered whether it is authentic, and more importantly, who the data is referring to. The information lists the violation and the disciplinary action by officer number not officer name. Without more, this Court has no way of knowing who committed the violations listed. Thus, Bailey's proffered evidence is irrelevant to this question.

McDonald in regard to the Fletcher incident, implies that Bailey benefited from his age and experience rather than suffered for it.

The City had a legitimate, non-discriminatory reason for referring Bailey to the Commission and recommending that the Commission demote Bailey as punishment for his conduct during the Fletcher incident. Bailey has failed to rebut this reason with relevant evidence of pretext.

**4. Forced Into Retirement by Harassment with a Multitude of False Charges.**—The City argues that Bailey retired voluntarily, not as a result of harassment from a number of false charges against him. Further, any question by Chief Winkle to Bailey about Bailey's reconsideration of his prior decision to retire occurred after Bailey faced legitimate reasons for disciplinary action. Therefore, Bailey was not faced with continued harassment about retiring.

Bailey counters that at the time of Chief Winkle's question, Bailey's performance was not an issue because the charges against him were false. First, his supervisors in the check fraud area never received complaints about his work, therefore, he could not be a substandard employee. Further, Bailey claims that he had not violated any work rules or made any sanctionable errors during the Fletcher incident. Finally, Bailey asserts that he did not mishandle evidence and testimony in a criminal matter as suggested in July 1997. Instead, when Chief Winkle asked Bailey about retirement, he faced equally negative choices: Either retire to escape from suspension and possible demotion or potentially jeopardies his retirement benefits by fighting the charges against him and be wrongfully terminated as a result. Bailey asserts that whether this was a "choice" at all is a question for a jury.

Bailey has not provided the Court with evidence that the charges about his conduct in the Fletcher incident or the allegations of his mishandling of testimony and evidence in a criminal trial were false. Nor does Bailey allege or state that he was "hounded about retirement despite evidence of adequate performance." *Kaniff,* 121 F.3d at 263. That his supervisor in the check fraud area had not received complaints about his work, but the department transferred him anyway, is not enough evidence of age discrimination by the City to rebut the evidence of Bailey's professional errors. The Court has already discussed that "[i]n the circumstances of this case, the suggestion of retirement does not rise to the level of direct evidence of age discrimination." *Id.* Without evidence that the deficiencies in his work performance cited by the City were pretextual, Bailey has not met his burden of production on the issue of discriminatory intent.

This holds true even if the Court were to accept Bailey's argument for pretext related to the City's decision to reassign him to the general investigation area. The evidence that Bailey's supervisor was unaware of the banking community's dissatisfaction with Bailey's work in the check fraud area cannot overcome the City's strong evidence of legitimate, non-discriminatory reasons for suggesting Bailey retire rather than face embarrassing disciplinary action. Bailey has not provided evidence that the City's statements about his misconduct in the Fletcher incident and in the July criminal case were false or lies. He has merely offered self-serving testimony that the charges against him were fabricated. Such conclusory statements will not overcome a showing of legitimate, non-discriminatory reasons for employment actions.

In summary, this Court does not have jurisdiction to hear Bailey's age discrimination claims against the City. If it did have jurisdiction, Bailey's assertion that the City discriminated against him when it transferred him into the general investigation group fails because that change was not an adverse employment action. Further, with reference to the City's disciplinary decisions regarding Bailey's misconduct during the Fletcher incident and the

July criminal case, Bailey has not overcome the City's proffered evidence of legitimate, non-discriminatory reasons for those actions. For these reasons, the City's motion for summary judgment on Bailey's ADEA claim should be **GRANTED.**

### C. § 1983

▪ Bailey brought an additional claim against Chief Winkle and Mayor Canan in both their official and individual capacities pursuant to 42 U.S.C. § 1983.[15] Bailey alleges that the ten day suspension imposed upon him by Chief Winkle on February 11, 1997 violated his Fourteenth Amendment right to procedural due process. The Defendants do not dispute that Bailey was not provided a hearing before his suspension. *See* Defs.' Reply Br. at 12.

▪ Section 1983 provides a remedy for violations of civil rights that are protected by the U.S. Constitution or other federal law. That section states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. Therefore, in order to survive a motion for summary judgment under § 1983, Bailey must provide evidence that a material issue of fact exists on one of two elements: (1) conduct by a person acting under color of state law; (2) that deprived him of rights, privileges, or immunities secured by the Constitution or laws of the United States, proximately

causing injury. *Larsen v. City of Beloit,* 130 F.3d 1278, 1282 (7th Cir.1997); *Brown v. City of Lake Geneva,* 919 F.2d 1299, 1301 (7th Cir.1990).

▪ The element the parties focus on is whether Bailey has shown that the City, Chief Winkle and/or Mayor Canan deprived him of a his constitutionally protected right to procedural due process. Thus, the questions for the Court are whether Bailey had a life, liberty or property interest in employment, and if that answer is affirmative, what process was due before Bailey was suspended. *See Larsen,* 130 F.3d at 1282; *Moulton v. Vigo County,* 150 F.3d 801, 804 (7th Cir.1998). Whether Bailey had a property interest in his job is a matter of state law. *See Moulton,* 150 F.3d at 804; *see also Larsen,* 130 F.3d at 1282 (citing *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). "Protected property interests can arise from such state law sources as statutes, contracts, legally binding rules and regulations, or the 'unwritten common law' of employment." *Moulton,* 150 F.3d at 804 (quoting *Lawshe v. Simpson,* 16 F.3d 1475, 1480 (7th Cir.1994) (citations omitted)). In Indiana, a police officer is an employee of the city and their relationship is defined by contract. *See Wencke v. City of Indianapolis,* 429 N.E.2d 295, 297 (Ind.Ct.App.1981) (citing *inter alia State ex rel. Palm v. City of Brazil,* 225 Ind. 308, 73 N.E.2d 485 (1947)); *see also Bernhardt v. State,* 479 N.E.2d 1367, 1369 (Ind.Ct.App.1985), *trans. denied.* Relevant statutory provisions apply if such provisions were expressly incorporated into the contract. *See Wencke,* 429 N.E.2d at 297.

---

15. A suit against state or municipal officials in their official capacities is considered by the Court as a claim against the City. *See* Sterling v. United States, 85 F.3d 1225, 1229 (7th Cir.1996) (stating that "an official capacity action against a government employee is essentially a suit against the government entity itself"). In order to succeed, a plaintiff in a § 1983 action against a municipality must show that the enforcement of a municipal policy or custom caused the alleged constitutional deprivation and its consequential damages. *See Collins v. City of Harker Heights,* 503 U.S. 115, 122–23, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *City of Canton v. Harris,* 489 U.S. 378, 385–86, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The parties do not address these issues, therefore, the Court need not address them further.

In the case at bar, the Defendants argue that in Indiana, although police officers have a property interest in their jobs by statute, they "have no legally protected property interest in suspensions of less than [ten] days." Defs.' Br. In Supp. Of Mot. For Summ.J. at 36 (citing *State ex rel. Dunlap v. Cross*, 403 N.E.2d 885, 888 (Ind.Ct.App.1980)). Defendants rely upon *State ex rel. Dunlap v. Cross*, 403 N.E.2d 885 (Ind.Ct.App.1980), and other cases for the proposition that the Indiana Supreme Court has upheld as constitutional the suspension of police officers for a period up to ten days because " 'due process does not require that every single question be open to appeal.' " Defs.' Br. In Supp. Of Mot. For Summ.J. at 36 (quoting *City of Crown Point v. Knesek*, 499 N.E.2d 261, 262 (Ind. 1986) and citing *Dortch v. Lugar*, 255 Ind. 545, 266 N.E.2d 25, 46 (1971)). The Court does not agree with the Defendants' reasoning.

The threshold issue in this case is whether Bailey has a property interest in continuous employment and the scope or nature of that property right. Thus, the Court must first look for evidence that the City has created a property right for police officers in continuous employment or that the City and police officers had contracted for a property right in continuous employment. Then the Court must discover the nature of that property right.

Absent other evidence of an employment contract, in determining whether a police officer has a property right in continuous employment, courts look at the specific statutes and ordinances that regulate the hiring and firing of police officers. *See Harrison v. City of Greenfield*, 966 F.2d 315, 315–16 (7th Cir.1992); *Garraghty v. Jordan*, 830 F.2d 1295, 1299 (4th Cir.1987); *Smith v. Eaton*, 910 F.2d 1469, 1471 n. 4 (7th Cir.1990) (citing *Parrett v. City of Connersville*, 737 F.2d 690, 694 (7th Cir. 1984)), *cert. denied; State ex rel. Dunlap v. Cross*, 403 N.E.2d 885, 886–87 (Ind.Ct. App.1980); *cf. City of Michigan City v. Austin*, 442 N.E.2d 705, 707–08 (Ind.Ct. App.1982) (applying same reasoning to fire fighters). Specifically, the Seventh Circuit

has held that the language of Indiana Code § 36–8–3–4 (formerly Indiana Code § 18–1–11–3) provides police officers a property right in continuous employment. *See Smith*, 910 F.2d at 1471 n. 4; *Parrett*, 737 F.2d at 694. However, an Indiana court that interpreted Indiana Code § 18–1–11–3, found that police officers had a property right in employment, however, the limit of that property right did not extend to suspensions of ten days or less. *Dunlap*, 403 N.E.2d at 888.

The statute the Seventh Circuit relied upon, and that the Defendants cite to this Court provides in relevant part that "a member of the police or fire department holds office or grade until the member is dismissed or demoted by the safety board...." Ind.Code § 36–8–3–4(b). In this case, the Defendants argue that this statute does confer such a property right on Bailey, but another statute limits that right. This Court does not agree that Indiana Code § 36–8–3–4 applies to police officers in the City.

First, Indiana Code § 36–8–3 sets out the role of a safety board and establishes rules for the government and discipline of police officers in second and third class cities. Ind.Code §§ 36–8–3–1 to 21. Within that chapter, section 36–8–3–4 describes the disciplinary procedures recommended by the Indiana legislature. That section states in relevant part:

> (b) ... *a member of the police or fire department holds office or grade until the member is dismissed or demoted by the safety board....* [A] member may be disciplined by demotion, dismissal, reprimand, forfeiture, or suspension upon either:
>
>> (1) conviction in any court of any crime; or
>>
>> (2) a finding and decision of the safety board that the member has been or is guilty of any one (1) or more of the following [list of causes].

Ind.Code § 36–8–3–4(b) (emphasis added). The remainder of the section describes the

relevant procedures for suspending a police officer, holding a hearing and appealing board decisions.

The City is one of the "second class" that has a full-time, paid police force, thus, on its face, that code chapter would apply to the City. *See City of Muncie v. Campbell,* 156 Ind.App. 59, 295 N.E.2d 379, 381 & n. 1 (1973) (stating that the merit provision at issue in that case, Indiana Code § 19–1–14–19, concerned only the city of Muncie under Indiana Code § 19–1–14–1, which restricts application of that chapter to "Cities of the Second Class located in counties of not less than 128,000 nor more than 138,000"). However, section 36–8–3–5 makes section 36–8–3–4 elective for a city or town that has a police and fire merit commission that is given the responsibility to establish merit systems for their police and fire departments. Section 36–8–3–5 states:

> Sections [36–8–3–]3, [36–8–3–]4, and [36–8–3–]4.1 of this chapter do not apply to a police or fire department having a board or commission established by statute or ordinance to establish or administer policies based on merit for the appointment, promotion, demotion, and dismissal of members of the department, unless the establishing law specifically incorporates one (1) or more of those sections.

Ind.Code § 36–9–3–5. *See also Austin,* 442 N.E.2d at 709–11 (discussing the changes in the Indiana statutes related to the creation and authority of police and fire merit commissions). The City has such a commission, therefore, if the Commission has not specifically incorporated section 36–8–3–4 into the City's merit system, that section does not apply to police officers employed there. From the evidence provided by the Defendants, it appears that the Commission never adopted section 36–8–3–4 into its merit system.

Instead, the City legislature readopted the old merit and disciplinary provisions under the grandfathering section that establishes the powers of each municipality to establish its own merit system. *See* Ind.Code §§ 36–8–3.5–1(a) to (b); *see also*

*City of Evansville v. International Ass'n of Fire Fighters, Local 357,* 516 N.E.2d 57, 60 (Ind.1987) (holding that Indiana Code § 36–8–3.5 was the exclusive method by which a city may establish its own merit system for police an fire departments, but "any existing system may continue even though it does not comply with this statute, ... [provided that] if [the old system adopted] is [subsequently] repealed, any new system must be compatible with [Indiana Code § ] 36–8–3.5"). Specifically, that section provides in relevant part:

> (a) This chapter applies to each municipality or township that has a full-time paid police or fire department. A municipality may exercise the power of establishing a merit system for its police or fire department under this chapter or by ordinance adopted under [Indiana Code § ] 36–1–4–14. This chapter does not affect merit systems established:
>
> > (1) by ordinance under [Indiana Code § ] 36–1–4–14, except was provided by subsection (e);
> >
> > or
> >
> > (2) by a prior statute, except as provided by subsection (b).
>
> (b) If a city had a merit system for its police or fire department under the former [Indiana Code §§ ] 18–4–12, 19–1–7, 19–1–14, 19–1–14.2, 19–1–14.3, 19–1–14.5, 19–1–20, 19–1–21, 19–1–19, 19–1–19.5, 19–1–31, 19–1–31.5, or 19–1–37.5, it may retain that system by ordinance of the city legislative body passed before January 1, 1983. The ordinance must initially incorporate all provisions of the prior statute but may be amended by the legislative body after December 31, 1984. . . .

Ind.Code §§ 36–8–3.5–1(a) to (b).

The City had a prior merit system under Indiana Code § 19–1–14, one of the provisions excepted in Indiana Code § 36–8–3.5–1(b). *See Campbell,* 295 N.E.2d at 381 & n. 1. Further, according to a certified copy of City Ordinance Number 924–82, in December 1982, the City's legislative body formally retained the merit system codi-

fied at Indiana Code § 19–1–14, incorporating all of the provisions of the prior statute. *See* Defs.' Ex. 11. Bailey offers no rebuttal or challenge to this evidence, other than the conclusory statement that he denies all of the Defendant's allegations. In addition, Bailey presents no evidence that the City adopted Indiana Code § 36–8–3–4 in part or in total at any time.

Looking at the statute that applies to the City, the Court finds no language similar to that in section 36–8–3–4 that "a member of the police . . . department holds office or grade until the member is dismissed or demoted by the safety board." Instead, the language is more vague stating that the police chief

> may impose reprimands and suspensions from duty without pay for a period not exceeding ten (10) days. If such action is taken by a chief, such chief shall within forty-eight (48) hours thereafter notify the commission in writing of such action and the reasons therefor. All other dismissals, suspensions and punishments of members of the police . . . department shall be by the commission and shall be for cause, and under the same rules of procedure including the right of appeal as are now or may hereafter be provided by laws pertaining thereto for cities of the second class. . . .

Ind.Code § 19–1–14–19 (1982). It is not clear from this language that a police officer in the City has a property right in continuous employment.[16] Although the statute clearly provides a disciplinary procedure that would deprive a police officer of employment for some period of time, " '[p]roperty' cannot be defined by the procedures provided for its deprivation any more than can life or liberty." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Therefore, this Court does not find that this statute, standing alone, establishes a property right in employment for Bailey. In light of this analysis, if Bailey has a property right in continuous employment it must be found in the collec-

16. The court in *State ex rel. Dunlap v. Cross*, 403 N.E.2d 885, 888 (Ind.Ct.App.1980), considered a police officer's right to due process under Indiana Code § 18–1–11–3. That code section stated in part: "Any member of [the] . . . police force who is dismissed from such force, as aforesaid, or is suspended therefrom for any period in excess of ten (1) days shall have the right to appeal to the circuit court. . . ." Ind.Code § 18–1–11–3 (1976). The court held that this statute did not create a property right in a suspension of ten days or less. *Dunlap*, 403 N.E.2d at 888. The court reasoned that any property right the police officer had could only be found in the statute, and the statute had limited the property right to employment and declined to extend that right to suspensions of ten days or less. *Id.*

Arguably, under the *Dunlap* analysis, the statute setting out disciplinary actions in the City similarly limits the property right of police officers in that jurisdiction. However, the Court is not persuaded that the language of Indiana Code § 19–1–14–19 bestows a property right in continuous employment, limited by the suspension clause. There is no apparent grant of right to employment in the section at all.

Also, in contrast to the *Dunlap* court, the Seventh Circuit in *Parrett v. City of Connersville*, 737 F.2d 690, 694 (7th Cir.1984), found that the property right conferred by Indiana Code § 18–1–11–3 was not so limited. In fact, the Seventh Circuit in a later decision, expressly rejected the *Dunlap* court's analysis stating that the *Dunlap* .

> court placed great emphasis on the lack of appellate recourse in the statute for a suspension of less than 10 days. But as the Supreme Court has made clear, state procedures do not in themselves decide the question of whether a property interest has been created. *Olim v. Wakinekona*, 461 U.S. 238, 250–51, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Hewitt v. Helms*, 459 U.S. 460, 471, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Because we treat [the plaintiff's] suspensions, no matter what their length, as constituting the deprivation of a property interest, we need not concern ourselves with counsel's convoluted and at times incomprehensible time computations.

*Id.* at 1471–72 n. 4. The *Parrett* and *Smith* courts were apparently focused on the language at the beginning of Indiana Code § 18–1–11–3 (and now Indiana Code § 36–8–3–4(b)) stating: "Every member of the fire and police forces . . . shall hold office until they are removed by said board." However, as discussed in the text above, that language, either in its old form or the new form, does not apply to the City.

tive bargaining agreement between the City and the police force, some other contract of employment or a course of dealing.

Bailey points the Court to language in the letter ordering him to appear before Chief Winkle to discuss his involvement in the Fletcher incident. Specifically, the language informs Bailey that he has the right to bring a representative to the meeting with him pursuant to the collective bargaining agreement between the City and the police force. Feb.1997 Order. Essentially, Bailey argues that this language, or the right to bring a representative with him itself, creates a genuine issue of fact about whether he was denied due process before deprivation of a property right in employment. However, without a copy of the collective bargaining agreement, this Court has no way of knowing whether Bailey's property rights in employment were different from those outlined in the City's merit system ordinance. Bailey offers no evidence of the collective bargaining agreement provisions or some other employment contract that confers upon him a property right in continuous employment. Regardless, even assuming Bailey could point the Court to such provisions, Bailey received all the process due under the circumstances.

■ If Bailey had a property interest in his continuous employment, the Defendants must have afforded him "notice and an opportunity to be heard prior to discipline." *Smith v. Town of Eaton,* 910 F.2d 1469, 1472 (7th Cir.1990) (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 547, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Garraghty v. Jordan,* 830 F.2d 1295, 1299–1300 (4th Cir.1987); *Pesce v. J. Sterling Morton High Sch.,* 830 F.2d 789, 793 (7th Cir.1987); *cf. Goss v. Lopez,* 419 U.S. 565, 581, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)). The notice and opportunity to be heard need only be commensurate with the nature of the property interest at stake. *Loudermill,* 470 U.S. 532, 547, 105 S.Ct.

1487, 84 L.Ed.2d 494 (1985). A court must balance the interests at stake to determine the necessary process due: (1) the private interest in retaining employment; (2) the governmental interest in the expeditious removal of unsatisfactory employees; (3) the avoidance of administrative burdens, and (4) the risk of an erroneous employment decision. *See id.* at 542–43, 105 S.Ct. 1487. Some pre-adverse action opportunity to respond is the apparent touchstone. *See id.* at 542, 105 S.Ct. 1487 (discussing *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) and *Barry v. Barchi,* 443 U.S. 55, 65, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979)); *see also Goss v. Lopez,* 419 U.S. 565, 573–74, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (stating that a student's opportunity to tell his or her side of the story before he or she is suspended helps guard against unwarranted deprivations).

■ Bailey's interest in avoiding suspension without pay must be measured with reference to both his loss in pay and his loss in standing amongst his peers and in the community. Bailey offers little evidence on this issue other than the number and length of suspensions of police officers during the time period 1992 to 1998. During that time period, the chief [17] gave a suspension of ten days approximately 17% of the times that suspensions were given at all. *See* Pl.'s Ex. 6 (listing the suspensions given to police officers for the years 1992 to 1998 by either the chief or the Commission). This statistic suggests that a ten day suspension without pay would have some stigma attached to it. However, here Bailey returned to work after his suspension without a reduction in pay, rank or responsibility. Furthermore, additional discipline recommended to the Commission was to take place with the all the notice and hearing protections Bailey sought. Under these circumstances the

---

**17.** The Court uses a generic term here because there are no facts that indicate whether Chief Winkle held the position of Chief of

Police during the entire time frame referenced in the evidence.

property interest at stake does not appear substantial.

On the other side of the scale, the City's interests in having an effective and swift discipline system for its police officers is justified by the risk to the public when an officer disobeys the rules and regulations that are set to ensure public safety. Courts agree that in police departments, " '[t]he government's interest in curtailing insubordination and enforcing orders is fundamental to the maintenance of public order and safety.' " *Harrison,* 966 F.2d at 317 (adopting the lower court's language on this issue). *See also Kokkinis v. Ivkovich,* 185 F.3d 840, 846 (7th Cir.1999) ("Police departments are quasi-military organizations; public safety depends upon good order and discipline."); *Garraghty,* 830 F.2d at 1302 (stating that the "[r]ealities of the work place, especially in the paramilitary environment of corrections departments, require that authority be respected and that discipline be swift"); *Dortch v. Lugar,* 255 Ind. 545, 266 N.E.2d 25, 46 (1971) (holding that absent specific property rights in continuous employment, police officers are removable at will, without cause or a hearing); *Dunlap,* 403 N.E.2d at 887 (adopting the reasoning of a New York court that said: "Police officers occupy a unique status in the maintenance of law and order in a community and the public interests would be seriously jeopardized in the case of a police officer if he were allowed to be incompetent or charged with misconduct and it was required that he be retained in office pending the hearing of the charges or the preparation and service of the charges. In the case of police officers the power to temporarily and summarily suspend in the case of misconduct or incompetency is absolutely indispensable.") (quoting *McElroy v. Trojak,* 21 Misc.2d 145, 147, 189 N.Y.S.2d 824 (N.Y.Sup.Ct.1959)).

The public's safety was exactly the concern that led to the suspension in this case. During the Fletcher incident, Bailey had violated rules and regulations designed specifically to protect the public during emergency responses by the police. The fact that negative public perception about the department's handling of the situation motivated in part the decision to suspend Bailey lends further support for the importance to the City in having an effective and swift means for disciplining its police officers. Maintaining the public's confidence is important to any organization charged with keeping public order and safety. Correspondingly, effective and swift discipline can help ensure public confidence in the police department remains high. Moreover, discipline is a necessary element for maintaining a competent and efficient police department. *See Garraghty,* 830 F.2d at 1302. The City's decision to allow for suspensions of ten days without more opportunity for rebuttal by a police officer is not out of proportion to its interest in establishing an efficient system that will reinforce its goal to preserve public safety.

Furthermore, Chief Winkle made the decision to suspend Bailey based on information gathered by independent persons including two of Bailey's peers. In fact, the internal investigation team specifically stated that they felt Bailey had been honest in his answers to their questions and tried the best he could to prevent a bad situation from turning worse. Int.Invest.Rep. at 4. Bailey's perspective on the Fletcher incident was certainly heard by these unbiased persons before they made their report to Chief Winkle. Based on this sequence of events, with Bailey's participation in the evidence gathering phase by disinterested persons, the risk of an erroneous deprivation was lessened.

Arguably, the process due Bailey in this situation is similar to that owed a student who is suspended for violating a school rule or policy. *See Goss,* 419 U.S. at 577–84, 95 S.Ct. 729. In *Goss,* the Court decided that a student must be given notice and a hearing, however, the notice need only consist of an informal discussion with the disciplinarian about the alleged misconduct, with an opportunity for the student to tell his or her side of the story before

the suspension is implemented. *Id.* at 582, 95 S.Ct. 729. The Court reasoned that "[t]o impose in each such case even truncated trial-type procedures might well overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness." *Id.* at 583, 95 S.Ct. 729. However, allowing the student to tell his or her side of the story, "provide[s] a meaningful hedge against erroneous action" because the disciplinarian's "discretion would be more informed." *Id.* at 583–84, 95 S.Ct. 729.

Although the property interest may be of greater weight in the case of a police officer's suspension than that of a student's suspension, the need of the City to discipline its police officers for misconduct is no less acute than that of a school to discipline its students. In fact, the need for an efficient and effective discipline system in a police department is even more acute because the public's safety is directly affected. In addition, similar to the administrative cost scenario when a school seeks to suspend a student, the increased administrative burden of holding a hearing before suspending a police officer for ten days would likely outweigh the cost of the occasional erroneous penalty. This is particularly true in light of the independent investigation into the facts that occurred in Bailey's case before Chief Winkle made the suspension decision.

Thus, the process due a police officer who receives a ten day suspension without pay need be no more formal than that due a student being suspended from school. All that is required is notice to the police officer of the charges against him, verbally and in writing, from the decision-maker, with the opportunity to present his side of the story to ensure that the decision-maker is aware of inconsistent facts before the suspension is imposed.

In this case, Bailey received such due process. Bailey was given notice of the charges against him when Chief Winkle read the Feb. 1997 Letter to him, and subsequently when Bailey received the letter. Chief Winkle also gave Bailey the opportunity to respond to the charges after he had read them. *See* Bailey Dep. at 114. Bailey made the decision to keep silent. *See id.* The fact that the charges were written up and the suspension term decided before the meeting does not change the fact that Bailey heard the charges against him and had an opportunity to correct Chief Winkle's perception immediately after Bailey learned the specific charges.

Finally, Bailey sued Mayor Canan and Chief Winkle in their personal capacities. The Court has found that there are no issues of material fact on the issue of a deprivation of rights. Even if Bailey's rights had been abridged, there are no genuine issues of material fact on the personal liability of the mayor or the chief.

 To hold either defendant individually liable, Bailey must prove that the defendant was personally involved in depriving him of his Fourteenth Amendment rights. *See Gossmeyer v. McDonald,* 128 F.3d 481, 494 (7th Cir.1997); *Wilson v. Town of Clayton,* 839 F.2d 375, 383–84 (7th Cir.1988). "Section 1983 does not recognize a doctrine of superior's liability." *Wilson,* 839 F.2d at 383–84. Therefore, absent knowledge or reckless disregard of a subordinate's conduct and approval of the basis for it, a supervisor is not liable. *See Gossmeyer,* 128 F.3d at 495. In addition to this principle, defendants in their individual capacities may raise a defense of qualified immunity. Qualified immunity is a doctrine that shields officials performing discretionary functions when their conduct does not violate a clearly established constitutional right. *See id.* "A right is clearly established when its contours are sufficiently clear so that a reasonable official would realize that what he is doing violates that right." *Id.* Bailey bears the burden of proof that the right is clearly established and may do so by pointing to a closely analogous case or by showing "that the defendants' conduct is so violative of the constitutional right that reasonable of-

ficials would know that their conduct was unconstitutional without guidance from courts." *Id.* at 495–95.

Bailey's claim against Mayor Canan fails because he did not provide evidence that Mayor Canan was personally involved with the decision to suspend him for his role in the Fletcher incident. Bailey argues that Mayor Canan had knowledge of Chief Winkle's alleged plan to put older workers in less desirable jobs. Therefore, the mayor had knowledge that Chief Winkle would suspend Bailey without pay for ten days pursuant to his involvement in the Fletcher incident, without opportunity for a formal hearing. However, knowledge of one act or alleged plan does not give rise to an inference of knowledge of the other. Moreover, Bailey admitted during his deposition that he included Mayor Canan in the suit because Chief Winkle worked for the mayor. Bailey cannot hold Mayor Canan personally liable under § 1983 absent direct involvement, knowledge or knowledge with reckless disregard of the consequences. Bailey's argument to the contrary fails because the inference that Bailey tries to establish does not support the allegation of a violation of due process. Furthermore, either Mayor Canan or Chief Winkle can succeed under a qualified immunity defense. All of the Defendants were under the perception that *Dunlap* and other case law clearly established that a police officer had no right to due process with respect to a ten day suspension. *See Dunlap,* 403 N.E.2d at 885; *see also Dortch,* 266 N.E.2d at 46; *but see Smith,* 910 F.2d at 1471 n. 4. However, as discussed above, it is not clear that a police officer in the City has a property right in continuous employment that would entitle him to due process at all. Therefore, because Chief Winkle in giving Bailey a ten day suspension was using his discretion in a manner consistent with the policies of the City and those policies were not clearly unconstitutional, Bailey may not hold either he or Mayor Canan personally liable for damages arising from the suspension.

In summary, with the evidence before the Court, Bailey did not establish that he had a property right in continuous employment that would trigger a right to due process before he was given a suspension. Even if there were such evidence, under the circumstances, Bailey was given all the process due him. Further, Bailey's claims against Mayor Canan and Chief Winkle in their personal capacities fail because Bailey did not provide evidence that Mayor Canan was directly involved in the suspension decision, nor did Bailey provide evidence that the suspension without a hearing was clearly unconstitutional. The Defendant's motion for summary judgment on Bailey's § 1983 claim should be **GRANTED.**

### IV. CONCLUSION

For the reasons discussed above, the Defendants' motion to accept their statement of material fact as true and uncontroverted is **GRANTED** in part and **DENIED** in part. In addition, the Defendants' motion to strike is **GRANTED** in part and **DENIED** in part.

Bailey's claim of age discrimination against the City is not properly before this Court because the Court lacks subject matter jurisdiction over ADEA claims against a state entity. Even if the Court did have jurisdiction, Bailey did not provide evidence that the City's legitimate, non-discriminatory reasons for its employment decisions were pretext for age discrimination.

Similarly, Bailey's 42 U.S.C. § 1983 claim alleging a violation of his Fourteenth Amendment right to procedural due process fails because Bailey did not provide evidence that he had a property right in continuous employment, and even if he had, the process he received was all that was due under the circumstances. Finally, Bailey did not provide evidence that Mayor Canan had personal involvement in the decision to suspend him that would subject the mayor to personal liability under 42 U.S.C. § 1983; nor did Bailey provide evi-

dence that either Chief Winkle or Mayor Canan had knowledge that the suspension violated a clearly defined constitutional right. For these reasons, the Defendants' motion for summary judgment is **GRANTED.**